# WILLIAMS v. FEARS.

### ERROR TO THE SUPREME COURT OF THE STATE OF GEORGIA.

No. 287. Argued October 29, 1900.—Decided December 10, 1900.

By a general revenue act of the State of Georgia, a specific tax was levied upon many occupations, including that of "emigrant agent," meaning a person engaged in hiring laborers to be employed beyond the limits of the State. *Held* that the levy of the tax did not amount to such an interference with the freedom of transit, or of contract, as to violate the Federal Constitution.

Nor was the objection tenable that the equal protection of the laws was denied because the business of hiring persons to labor within the State was not subjected to a like tax.

The imposition of the tax fell within the distinction between interstate commerce, or an instrumentality thereof, and the mere incidents which

may attend the carrying on of such commerce. These labor contracts were not in themselves subjects of traffic between the States, nor was the business of hiring laborers so immediately connected with interstate transportation or interstate traffic that it could correctly be said that those who followed it were engaged in interstate commerce, or that the tax on that occupation constituted a burden on such commerce.

R. A. WILLIAMS was arrested on a warrant issued by the county court of Morgan County, Georgia, and placed in the county jail on his failure to give bond pending his trial. Thereupon he made application to the judge of the superior court within and for that county for a writ of *habeas corpus* by petition alleging that the warrant under which he was arrested charged him with a violation of the tenth paragraph of section two of the General Tax Act of Georgia, of 1898, and that his restraint was illegal because that part of the act was in conflict with clause three of section eight, and with clause five of section nine, of article one, and with section two of article four, of the Constitution of the United States; and also with the Fourteenth Amendment. The writ of *habeas corpus* was duly issued and the application heard on the return thereto, which resulted in the denial of the petition by the superior court, and the remanding of Williams to custody. The case was then carried to the Supreme Court of Georgia, where, on April 11, 1900, judgment was rendered affirming the judgment of the superior court. 35 S. E. Rep. 699.

The title of the General Tax Act of 1898, (Georgia Laws, 1898, p. 21,) read thus:

"An act to levy and collect a tax for the support of the state government and the public institutions; for educational purposes in instructing children in the elementary branches of an English education only; to pay the interest on the public debt, and to pay maimed Confederate soldiers and widows of Confederate soldiers such amounts as are allowed them by law for each of the fiscal years eighteen hundred and ninety-nine and nineteen hundred; to prescribe what persons, professions and property are liable to taxation; to prescribe the methods of collecting and receiving said taxes; to prescribe the method of ascertaining the property of the State subject to taxation; to

prescribe additional questions to be propounded to taxpayers, and to provide penalties and forfeitures for non-payment of taxes; to prescribe how the oath of taxpayers shall be administered, and provide penalties for violation thereof, and for other purposes."

Section 2 provided "that in addition to the ad valorem tax on real estate and personal property as required by the constitution and provided for in the preceding section, the following specific taxes shall be levied and collected for each of said fiscal years eighteen hundred and ninety-nine and nineteen hundred."

Then followed paragraphs imposing poll taxes, and taxes on lawyers, doctors, photographers, auctioneers, keepers of pool and billiard tables, traveling vendors of patent or proprietary medicines, special nostrums, jewelry, paper, soap or other merchandise, local insurance agents, etc.

Paragraph 10 was as follows:

"Upon each emigrant agent, or employer or employé of such agents, doing business in this State, the sum of five hundred dollars for each county in which such business is conducted."

Section 4 was as follows:

"Be it further enacted by the authority aforesaid, That the taxes provided for in paragraphs 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31 and 32 of section 2 of this act shall be paid in full for the fiscal years for which they are levied to the tax collectors of the counties where such vocations are carried on at the time of commencing to do business specified in said paragraphs. Before any person taxed by paragraphs 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31 and 32 of section 2 of this act shall be authorized to carry on said business they shall go before the ordinary of the county in which they propose to do business and register their names, places of business, and at the same time pay their taxes to the tax collector; and it shall be the duty of said ordinary to immediately notify the comptroller general and the tax collector. Any person failing to register with the ordinary, or, having registered, failing to pay the tax as herein required, shall be liable to indictment for misdemeanor, and, on conviction, shall be

fined not less than double the tax, or be imprisoned as prescribed by section 1039 of volume III of the Code of 1895, or both, in the discretion of the court. One-half of said fine shall be applied to the payment of the tax, and the other to the fund of fines and forfeitures for use of officers of court."

*Mr. James Davison* for plaintiff in error.

*Mr. James M. Terrell* for defendants in error.

Mr. Chief Justice Fuller, after stating the case, delivered the opinion of the court.

Persons following the occupations named in some twenty-nine paragraphs of section 2 of the Tax Act of 1898, if they failed to register their names before the ordinary, or, having registered, failed to pay their taxes, as required by section 4, were liable to indictment for misdemeanor.

The Supreme Court of Georgia pointed out that it did not distinctly appear whether Williams was charged with having done business without registering, or without paying the tax, but considered that to be immaterial since he could not be punished for a failure to do either, if the provision imposing the tax were unconstitutional.

As preliminary to considering the validity of the provision the court, as matter of orginal definition, and in view of prior legislation, (Acts, 1876, p. 17; Acts, 1877, p. 120; Code, 1882, § 4598, *a, b, c,*) held that the term "emigrant agent," as used in the General Tax Act of 1898, meant a person engaged in hiring laborers in Georgia to be employed beyond the limits of that State.

The court called attention to the fact that while previous acts had required a license, this act provided for a specific tax on the occupation of emigrant agents in common with very many other occupations, the declared purpose of the levy being for the support of the government, and ruled that the question of whether the tax was so excessive as to amount to a prohibition on the transaction of that business, did not arise, and, indeed, was not raised.

The inquiry is, then, whether a state law taxing occupations is invalid so far as applicable to the pursuit of the business of hiring persons to labor outside the state limits because in conflict with the Federal Constitution.

On behalf of plaintiff in error it is insisted that paragraph ten is in conflict with the Fourteenth Amendment because it restricts the right of the citizen to move from one State to another, and so abridges his privileges and immunities; impairs the natural right to labor; and is class legislation, discriminating arbitrarily and without reasonable basis.

Undoubtedly the right of locomotion, the right to remove from one place to another according to inclination, is an attribute of personal liberty, and the right, ordinarily, of free transit from or through the territory of any State is a right secured by the Fourteenth Amendment and by other provisions of the Constitution.

And so as to the right to contract. The liberty, of which the deprivation without due process of law is forbidden, " means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary and essential to his carrying out to a successful conclusion the purposes above mentioned; . . . although it may be conceded that this right to contract in relation to persons or property or to do business within the jurisdiction of the State may be regulated and sometimes prohibited when the contracts or business conflict with the policy of the State as contained in its statutes." *Allgeyer* v. *Louisiana*, 165 U. S. 578, 589, 591; *Holden* v. *Hardy*, 169 U. S. 366.

But this act is a taxing act, by the second section of which taxes are levied on occupations, including, by paragraph ten, the occupation of hiring persons to labor elsewhere. If it can be said to affect the freedom of egress from the State, or the freedom of contract, it is only incidentally and remotely. The

individual laborer is left free to come and go at pleasure, and to make such contracts as he chooses, while those whose business it is to induce persons to enter into labor contracts and to change their location, though left free to contract, are subjected to taxation in respect of their business as other citizens are.

The amount of the tax imposed on occupations varies with the character of the occupation. Dealers in futures are compelled to pay one thousand dollars annually for each county in which the business is carried on; circus companies exhibiting in cities or towns of twenty thousand inhabitants or more, one thousand dollars each day of exhibition; peddlers of cooking stoves or ranges, two hundred dollars in every county in which such peddler may do business; peddlers of clocks, one hundred dollars; and so on.

The general legislative purpose is plain, and the intention to prohibit this particular business cannot properly be imputed from the amount of the tax payable by those embarked in it, even if we were at liberty on this record to go into that subject.

It would seem, moreover, that the business itself is of such nature and importance as to justify the exercise of the police power in its regulation. We are not dealing with single instances, but with a general business, and it is easy to see that if that business is not subject to regulation, the citizen may be exposed to misfortunes from which he might otherwise be legitimately protected.

Nor does it appear to us that the objection of unlawful discrimination is tenable.

The point is chiefly rested on the ground that inasmuch as the business of hiring persons to labor within the State is not subjected to a like tax, the equal protection of the laws secured by the Fourteenth Amendment is thereby denied.

In *Shepperd* v. *Commissioners*, 59 Georgia, 535, approved and followed in this case, the Supreme Court of Georgia decided that the act of 1876, which required a license as preliminary to carrying on this business, was not unconstitutional on this ground, for the reason that it did not appear that hiring for internal employment had become a business in Georgia, or was

pursued as such by any person or persons. And for the further reason that the State could properly discriminate in its police and fiscal legislation between occupations of similar nature but of dissimilar tendency; between those which tended to induce the laboring population to leave, and those which tended to induce that population to remain.

We are unable to say that such a discrimination, if it existed, did not rest on reasonable grounds, and was not within the discretion of the state legislature. *American Sugar Refining Company* v. *Louisiana*, *ante*, 89, and cases cited.

In fine, we hold that the act does not conflict with the Fourteenth Amendment in the particulars named.

Counsel for plaintiff in error further contends that the imposition of the tax cannot be sustained because in contravention of clause three of section eight, and clause five of section nine of article one of the Constitution.

Clause five of section nine provides that "no tax or duty shall be laid on articles exported from any State." The facts of this case do not bring it within the purview of this prohibition upon the power of Congress, and it need not be considered as a substantive ground of objection.

The real question is, does this law amount to a regulation of commerce among the States? To answer that question in the affirmative is to hold that the emigrant agent is engaged in such commerce, and that this tax is a restriction thereon.

In *Mobile County* v. *Kimball*, 102 U. S. 691, 702, Mr. Justice Field, delivering the opinion of the court, said: "Commerce with foreign nations and among the States, strictly considered, consists in intercourse and traffic, including in these terms navigation and the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities." Broad as is the import of the word "commerce" as used in the Constitution, this definition is quite comprehensive enough for our purposes here.

These agents were engaged in hiring laborers in Georgia to be employed beyond the limits of the State. Of course, transportation must eventually take place as the result of such contracts, but it does not follow that the emigrant agent was en-

gaged in transportation or that the tax on his occupation was levied on transportation.

In *McCall* v. *California*, 136 U. S. 104, we held that the agency of a line of railroad between Chicago and New York, established in San Francisco for the purpose of inducing passengers going from San Francisco to New York to take that line at Chicago, but not engaged in selling tickets for the route, or receiving or paying out money on account of it, was an agency engaged in interstate commerce. But there the business was directly connected with interstate commerce, and consisted wholly in carrying it on. The agent was the agent of the transportation company, and he was acting solely in its interests.

So in *Norfork & Western Railroad Company* v. *Pennsylvania*, 136 U. S. 114, it was ruled that a tax imposed by a State on a corporation engaged in the business of interstate commerce, as described, for the privilege of keeping an office in the State, was a tax on commerce among the States.

On the other hand, it was held in *Nathan* v. *Louisiana*, 8 How. 73, that a broker dealing in foreign bills of exchange was not engaged in commerce, but in supplying an instrument of commerce, and that a state tax on all money or exchange brokers was not void as to him as a regulation of commerce.

In *Paul* v. *Virginia*, 8 Wall. 168, 183, it was decided that issuing a policy of insurance was not a transaction of commerce, and it was said: "The policies are simple contracts of indemnity against loss by fire, entered into between the corporations and the assured for a consideration paid by the latter. These contracts are not articles of commerce in any proper meaning of the word. They are not subjects of trade and barter offered in the market as something having an existence in value independent of the parties to them. They are not commodities to be shipped or forwarded from one State to another and then put up for sale."

Again, in *Hooper* v. *California*, 155 U. S. 648, 655, it was held that a section of the penal code of California making it a misdemeanor for a person in that State to procure insurance for a resident in the State from an insurance company not in-

corporated under its laws, and which had not complied with its laws relative to insurance, was not a regulation of commerce. Mr. Justice White there adverts to the real distinction on which the general rule and its exceptions are based, "and which consists in the difference between interstate commerce or an instrumentality thereof on the one side and the mere incidents which may attend the carrying on of such commerce on the other. This distinction has always been carefully observed, and is clearly defined by the authorities cited. If the power to regulate interstate commerce applied to all the incidents to which said commerce might give rise and to all contracts which might be made in the course of its transaction, that power would embrace the entire sphere of mercantile activity in any way connected with trade between the States; and would exclude state control over many contracts purely domestic in their nature."

The imposition of this tax falls within the distinction stated. These labor contracts were not in themselves subjects of traffic between the States, nor was the business of hiring laborers so immediately connected with interstate transportation or interstate traffic that it could be correctly said that those who followed it were engaged in interstate commerce, or that the tax on that occupation constituted a burden on such commerce.

Nor was the imposition in violation of section 2 of Article IV, as there was no discrimination between the citizens of other States and the citizens of Georgia.

*Judgment affirmed.*

MR. JUSTICE HARLAN dissented.