15773

PRUDENTIAL INS. CO. OF AMERICA v. MURPHY, INSURANCE COMMISSIONER

(35 S. E. (2d), 586)

*Messrs. McKay & McKay,* of Columbia, Counsel for Petitioner,

*Messrs. John M. Daniel,* Attorney General, and *M. J. Hough, T. C. Callison* and *Claude K. Wingate,* Assistant Attorneys General, of Columbia, Counsel for Respondent,

September 13, 1945.

PER CURIAM.

For a great many years, perforce the decision of the Supreme Court of the United States in *Paul v. State of Virginia,* 8 Wall., 168, 75 U. S., 168, 19 L. Ed., 357, the transaction of the business of insurance across state lines was not interstate commerce and, therefore, was not subject to the control of Congress. 29 Am. Jur., Insurance, Sec. 35. This long standing status was upset by the result of the recent case of *United States v. Southeastern Underwriters Ass'n*

322 U. S., 533, 64 S. Ct., 1162, 88 L. Ed., 1440. Overruling the earlier case, the latter held that when the insurance business crosses state boundaries, it is interstate commerce. Because of the complexities and colossal nature of this far-flung business, it was feared in many quarters that considerable chaos might result from the departure of the Southeastern Underwriters decision from the former rule, but for an Act of Congress which was soon thereafter passed.

The latter is known as the McCarran Act, passed February 27, 1945, Public Law 15, 79th Congress, 15 U. S. C. A., § 1011 *et seq.* The portions pertinent to the present controversy are set out below:

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, [Section 1.] That the Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

"Sec. 2. (a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

"(b) No Act of Congress shall be construed to invalidate, impair or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: Provided, That after January 1, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission

Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law."

Unquoted Sections 3 and 4 preserve the applicability of certain provisions of the Sherman Act, 15 U. S. C. A., §§ 1-7, 15 note, and the applicability of the National Labor Relations Act, 29 U. S. C. A., § 151 *et seq.,* the Fair Labor Standards Act, 29 U. S. C. A., § 201 *et seq.,* and the Merchant Marine Act, 46 U. S. C. A., § 861 *et seq.*

The Prudential Insurance Company of America is in this State a "foreign" life insurance company, that is, it is incorporated under the laws of New Jersey and its home office and the bulk of its property are located in the city of Newark in that State. However, it has solicited business and sold insurance contracts and policies to residents of South Carolina since the year 1897. At the end of 1944 it had in force in this State 26,373 policies insuring the lives of about twenty thousand persons for amounts aggregating over thirty million dollars; and paid claims in that year of $457,602.28 on policies covering the lives of South Carolinians. (In the face of these figures it does not appear that the tax law now resisted was "hostile in conception" or is "burdensome in result"—the words of Mr. Justice, Cardozo in *Baldwin v. G. A. F. Seelig, Inc.,* 294 U. S., 511, 55 S. Ct., 497, 502, 79 L. Ed., 1032, 101 A. L. R., 55.

The Company brought this action in the Original Jurisdiction of this Court, by permission, in attack upon the validity of the license tax of three per cent. which it has heretofore paid on premiums collected here, under the provisions of the present Sections 7948 and 7949 of the South Carolina Code of Laws of 1942. While the tax is a flat one, as indicated, it is subject to a graduated reduction in proportion to the amount of certain financial investments which the company may make and report in the State of South Carolina.

It is not contended that the latter or any other feature of the law under attack is discriminatory against petitioner as compared with any other member of the class to which it belongs, to wit, "foreign" insurance companies. But it is alleged that this tax which has before been paid without protest by petitioner has become invalid, and therefore unenforceable, by reason of the law declared in the *Southeastern Underwriters case, supra,* in view of the Federal constitutional authorization of Congress to regulate commerce among the states, and the many decisions of the Federal Courts thereabout. It is also alleged in the petition that the tax violates a section of our State Constitution, but the point was not argued and is, therefore, deemed to have been abandoned in accord with the established rule.

Petitioner presents a two-pronged attack, first that the tax constitutes a burden upon its interstate business, transacted in part within the state, and, second, that it is discriminatory against petitioner for it is not applicable to insurance corporations of the state, domestic companies, which are exempted from the law's provisions. The respondent, the Insurance Commissioner of the state and charged with the enforcement of the law, first contends that the proceeding is really against the State itself, which is immune from suit without its express permission. His demurrer and return also raise the other issues which will be discussed.

Disposition will be first made of the point of the respondent that the action is not maintainable because it is in reality against the State, without its permission, and, therefore, in violation of its sovereign immunity from suit. This is foreclosed by former pronouncements of this Court, in view of the fact that there is no adequate remedy at law, such as payment of the taxes under protest and suit for recovery, if they are illegally assessed. It was said in *Santee River Cypress Co. v. Query,* 168 S. C., 112, 167

S. E., 22, as follows: "It is not only within the power of a Court of equity, but the duty rests upon it, to enjoin the collection of an illegal tax in those cases where no adequate legal remedy is provided for the aggrieved taxpayer. *Ware Shoals Mfg. Co. v. Jones,* 78 S. C., 211, 58 S. E., 811." The eleventh amendment to the Federal Constitution, attempted to be invoked by respondent, is expressly applicable only to the Courts of that jurisdiction. *Federal Land Bank of Columbia v. State Highway Department,* 172 S. C., 174, 173 S. E., 284; *State of Missouri v. Fiske,* 290 U. S., 18, 54 S. Ct., 18, 78 L. Ed., 145.

We proceed then to the heart of the controversy. It is the clear intent of Congress to refrain for the present from the regulation and taxation of insurance, even as to the activities of it which undoubtedly constitute interstate commerce under the authority of *United States v. Southeastern Underwriters Ass'n, supra,* with the exceptions hereinabove noted.

It would be difficult, if not impossible, to compose clearer statements than are contained in Sections 1 and 2(a) of the McCarran Act, which are quoted again for emphasis:

"[Section 1.] That the Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

"Sec. 2(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business."

It should be said for a first ground for refusal of the injunction sought that, upon examination, the license tax which petitioner resists for the first time, and so far appar-

ently alone among the many non-resident insurance companies operating in the state, may not be as burdensome as first appears, or even at all so, and may, therefore, be also non-discriminatory against a "foreign" company, such as petitioner, and in favor of a domestic (resident) company, which latter is expressly exempt from this particular tax. In this view, it is neither a burden upon interstate commerce nor discriminatory against a foreign company. Statistics are included in the petition and uncontested by the return which show the amount of the premiums tax paid by petitioner and certain taxes paid by comparable, competing domestic companies, but they confessedly do not include the property taxes paid by the resident companies on their home office buildings, furniture, equipment, personal property investments, etc.— taxes of a nature which petitioner pays none here which correspond. These petitioners doubtless pay in its home state of New Jersey, but not here, as do the resident companies. It does not appear in the record whether the state of New Jersey has a similar license tax to that of South Carolina (applicable to our and other non-resident insurance companies which may do business there) to which petitioner now objects, but the tax is not at all uncommon among the states. Annotations, 49 A. L. R., 726, 77 A. L. R., 1490 and 83 A. L. R., 464.

Thus, upon the showing made, there is no merit in the contention that the tax is discriminatory for there is no proof that there is a net or real discrimination against petitioner, a foreign insurance company, as compared with a domestic one, under the tax laws of this state, to which it is subject in the conduct of its business here.

Turning to the gravamen of the complaint, that the tax being upon interstate commerce is *ipso facto* a burden thereon, irrespective of discrimination, we see no reason on the record or in argument to hold that it was not intended to be

included by Congress in the "taxation by the several States of the business of insurance," which the McCarren Act declared is in the public interest and directed that the insurance business should continue to be subject thereto.

■ Congress is authorized by the Constitution of the United States to regulate commerce between the states. The words of that great document are quite plain thereabout, as follows: "The Congress shall have Power * * * (3) To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Art. 1, par. 8.

We are unable to see therein any obstacle to the course of Congress in deliberately refraining from regulation of any particular field of interstate commerce, which course is clearly charted by the McCarran Act insofar as regulation by taxation of the insurance business is concerned, unless a necessity for uniformity should require the desistance of the states. We are unable to perceive the latter condition with respect to the taxation of insurance companies. Certainly they have thriven under the existing system of state taxation. The staggering figures in the record in this case, indicating the gigantic size of petitioner's business, prove it.

It is repeated for emphasis and clarity that there is no apparent necessity for uniformity of the rate of the premium receipts tax of the various states which would invalidate (on that account alone) state legislation upon the subject, which lies in a field deliberately and advisedly unoccupied by Congressional legislative action. *Kelly v. State of Washington,* 302 U. S., 1, 58 S. Ct., 87, 82 L. Ed., 3. It might with equal reason be contended that the property tax assessments and rates should be the same in all states, which we think has never been proposed. See, for lack of a federal question in such a tax (at the time of that decision), *Continental Assur. Co. v. State of Tennessee,* 311 U. S., 5, 61 S. Ct., 1, 85 L. Ed., 5.

There is a very long-standing precedent for the propriety and efficacy of the McCarran Act. It is found in *Cooley v. Board of Wardens of Port of Philadelphia,* 12 How., 299, 53 U. S., 299, 13 L. Ed., 996. There one of the major questions was the validity of a law of Pennsylvania fixing pilotage fees (the proceeds of which were applied to the relief of indigent local pilots and their dependents) affecting ocean shipping in interstate commerce. At the first session of Congress it was enacted on August 7, 1789, 1 Stat., 54, 46 U. S. C. A., § 211, that pilots should be under the regulations of the state laws, present and future, until further legislation by Congress. Upon the strength of the latter, the local law was upheld and the Court expressly said that the grant of commercial power to Congress (the commerce clause) does not contain any terms which exclude the states from exercising authority over its subject-matter. The principle of this decision is stated in the modern text of American Jurisprudence, Vol. 11, p. 18, as follows: "Strictly speaking, Congress cannot delegate to the states its power over interstate and foreign commerce. However, where the subject is one upon which the states have the power to legislate in the absence of action by Congress, it may validly be provided by Congress that state statutes shall be controlling." And see the approving citation of it in the *Minnesota Rate Cases (Simpson v. Shepard),* 230 U. S., 352, 33 S. Ct., 729, 57 L. Ed., 1511, 48 L. R. A. (N. S.), 1151, Ann. Cas., 1916A, 18.

The author of the opinion of the Court in *United States v. Southeastern Underwriters Ass'n, supra* (322 U. S., 533, 64 S. Ct., 1170), pointed the way to the course thus far followed by Congress when he said:

"Another reason advanced to support the result of the cases which follow *Paul v. [State of] Virginia,* has been that, if any aspects of the business of insurance be treated as inter-

state commerce, 'then all control over it is taken from the states and the legislative regulations which this court has heretofore sustained must be declared invalid.' Accepted without qualification, that broad statement is inconsistent with many decisions of this Court. It is settled that, for Constitutional purposes, certain activities of a business may be intrastate and therefore subject to state control, while other activities of the same business may be interstate and therefore subject to federal regulation. And there is a wide range of business and other activities which, though subject to federal regulation, are so intimately related to local welfare that, in the absence of Congressional action, they may be regulated or taxed by the states. In marking out these activities the primary test applied by the Court is not the mechanical one of whether the particular activity affected by the state regulation is part of interstate commerce, but rather whether, in each case, the competing demands of the State and national interests involved can be accommodated. And the fact that particular phases of an interstate business or activity have long been regulated or taxed by states has been recognized as a strong reason why, in the continued absence of conflicting Congressional action, the state regulatory and tax laws should be declared valid."

From one of the supporting cases cited by the Court for the foregoing, *New York Life Ins. Co. v. Deer Lodge County,* 231 U. S., 495, 34 S. Ct., 167, 173, 58 L. Ed., 332, the following is quoted:

"There are cognate cases to the cited cases; of contracts incident to commerce, but not of themselves commerce. In *Williams v. Fears,* 179 U. S., 270, 21 S. Ct., 128, 45 L. Ed., 186, there was levied by the state of Georgia a tax upon each emigrant agent or employer or employee of such agent, doing business in the state. The law imposing the tax was attacked as a violation of the commerce clause of the Con-

stitution of the United States. Commerce was defined, quoting Mr. Justice Field, in *Mobile County v. Kimball,* 102 U. S., 691, 702, 26 L. Ed., 238, 241, to 'consist in intercourse and traffic, including in these terms navigation and the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities.' The court considered the definition comprehensive enough for the purpose of the case, and, testing its application, said, by Mr. Chief Justice Fuller: 'These agents were engaged in hiring laborers in Georgia, to be employed beyond the limits of the state. Of course, transportation must eventually take place as the result of such contracts, but it does not follow that the emigrant agent was engaged in transportation.' The conclusion was supported by cases, among others, *Paul v.* [*State of*] *Virginia and Hooper v.* [*People ·of State of*] *California,* 155 U. S., 648, 15 S. Ct., 207, 39 L. Ed., 297. On the authority of the same cases and *New York Life Ins. Co. v. Cravens.* [178 U. S., 389, 20 S. Ct., 962, 44 L. Ed., 1116] in *Ware & Leland v. Mobile County,* 209 U. S., 405, 28 S. Ct., 526, 52 L. Ed., 855, 14 Ann. Cas. 1031, it was held that contracts by brokers for the sale of cotton for future delivery, where the transactions were closed by contracts completed and executed in one state, although the orders were received from another state, were legally subject to a tax. Such contracts, it was said, were not 'the subjects of interstate commerce, any more than in the insurance cases, where the policies are ordered and delivered in another state than that of the residence and office of the company.'

"In *Engel v. O'Malley,* 219 U. S., 128, 31 S. Ct., 190, 55 L. Ed., 128, a law of New York forbade individuals or partnerships to engage in the business of receiving deposits of money for safe-keeping or for the purpose of transmission to another, or for any other purpose, without a license from the comptroller. It was attacked as a violation of the commerce clause of the Constitution. The case was decided to be

similar in principle to *Ware & Leland v. Mobile County* and *Williams v. Fears,* and the law was sustained."

In the dissenting opinion of the Chief Justice to the judgment of the majority in the *Southeastern Underwriters case,* he emphasized the confusion and conflict (between national and state jurisdictions) which he anticipated; but the most that he said concerning "state taxes which may now be thought to discriminate against the interstate commerce" (his words) was that they would be of seriously doubtful validity. And this was, of course, before the important enactment by Congress of the McCarran law, which was manifestly intended to allay such fears and doubts by temporarily, at least, removing the grounds of them.

The old, but leading case of *Crutcher v. Commonwealth of Kentucky,* 141 U. S., 47, 11 S. Ct., 851, 853, 35 L. Ed., 649, contains the significant statement in the opinion that is emphasized in the following quotation:

"To carry on interstate commerce is not a franchise or a privilege granted by the state; it is a right which every citizen of the United States is entitled to exercise under the constitution and laws of the United States; and the accession of mere corporate facilities, as a matter of convenience in carrying on their business, cannot have the effect of depriving them of such right, *unless Congress should see fit to interpose some contrary regulation on the subject.*"

In this instance Congress has seen fit to interpose, and has interposed, a "contrary regulation on the subject" by passage of the McCarran Act which is quite simple in its effect, that is, that for the present the regulation (with certain now irrelevant exceptions) and taxation of the interstate business of insurance shall continue by the states. The Act goes further, that any possible doubt may be removed, by the inclusion of the provision to the effect that

there is no silence of Congress which might be construed to mean that this form of interstate commerce should go on without regulation or any state legislation which might be held to be a burden upon it and, therefore, in conflict with the Commerce clause of the Constitution.

Congress has plenary power over interstate commerce and we know of no legal obstacle to the exercise of it embodied in the McCarran Act. "Since the commerce clause of the Federal Constitution is not a limitation upon the power of Congress, a statute enacted by Congress, for the District of Columbia, imposing a tax upon the privilege of doing business within the district, is not subject to the objection that it interferes with or is a burden upon interstate commerce. *General Electric Co. v. District of Columbia,* 1940, 71 App. D. C., 321, 110 F. (2d), 261; *Colgate Palmolive Peet Co. v. District of Columbia,* 1940, 71 App. D. C., 324, 110 F. (2d), 264. Both of these decisions followed *Neild v. District of Columbia,* 1940, 71 App. D. C., 306, 110 F. (2d), 246, which involved a co-partnership rather than a foreign corporation." 139 A. L. R., 951.

The brunt of petitioner's argument has been answered in what has been said, but it is incidentally also contended that the application of the tax to the premiums received by petitioner upon its South Carolina business violates the equal protection and due process clauses of the Fourteenth Amendment to the Federal constitution (which are also embraced in Art. 1, Sec. 5 of our State Constitution). But, in any view of it, it does not, under the decisions of the United States Supreme Court. There need only be cited the current case of *Lincoln Nat. Life Ins. Co. v. Read,* 325 U. S., 1220, 65 S. Ct., 120 which was decided during the pendency of this proceeding.

Report of the latter case discloses that the State of Oklahoma levies a premium tax on foreign insurance companies,

similar to the tax questioned in the case at bar, imposed by the State Constitution, and the legislature increased the tax to four per cent. The plaintiff in the action was an Indiana corporation and resisted payment upon the ground that the assessment was discriminatory, because not applicable to domestic insurance companies, and is, therefore, violative of the Fourteenth Amendment. The Court made short shrift of the contention and upheld the tax. Question was there also raised concerning a point not involved in the instant contest, to wit, that the plaintiff company was admitted to do business in the state before the statutory increase of the tax, which was, therefore not legally applicable to it. *Hanover Fire Ins. Co. v. Harding,* 272 U. S., 494, 47 S. Ct., 179, 71 L. Ed., 372, 49 A. L. R., 713. The Court also overruled this contention, upon facts similar to those of our case. But, as already stated, that point is not made in the present proceeding. It appears that the position was not taken in that case that the plaintiff was engaged in interstate commerce, and the question was not discussed, but the case was decided long after the decision in the *Southeastern Underwriters Ass'n case, and also after passage of the McCarran Act.*

Also decided after the *Southeastern Underwriters Ass'n case,* but apparently before the McCarran Act, was *First Nat. Ben. Soc. v. Garrison,* D. C., 58 F. Supp., 972, 984, in which the plaintiff, an Arizona company, challenged the validity of the California statute regulating the conduct of the insurance business in that state. Taxation was not involved but the lengthy opinion is enlightening upon the subject of the status of the law after the adjudication by the Supreme Court (in the *Southeastern Underwriters case*) that insurance is commerce, interstate where it crosses state lines, and in the absence of Congressional legislation. State regulation was upheld.

One of the postulates set forth in the Garrison decision, number two, is as follows: "It is a well-established principle

that Congress may circumscribe its regulation of interstate commerce and occupy a limited field * * *". (It is very clear to us that Congress has expressly circumscribed its regulation of the interstate business of insurance by the enactment of the provisions of the McCarran Act.) Cited with approval was another of the utterances of the Chief Justice in his dissenting opinion in the *Southeastern Underwriters case* (not at all, however, in conflict with the leading opinion) to the effect that the judgment of the Court in the latter case nowhere gave the slightest intimation that all state laws governing insurance companies were rendered *ipso facto* void but that such matters would have to be decided by a case-to-case determination with consideration of all the respective relevant facts and circumstances; and the California District Court concluded (and this was before the McCarran Act) that it is conceivable that as Congress legislates on insurance, state laws will fall, but only to the extent that they are supplemented (supplanted?) by Federal legislation, and that in the meantime state statutes will continue to control. There were further copious quotations from the opinion of Mr. Chief Justice Stone, with which this opinion need not be extended.

Upon the factual consideration aforementioned and the legal grounds stated, the petition is dismissed, the rule discharged, the temporary restraining order (heretofore issued) dissolved and permanent injunction denied.

MR. CHIEF JUSTICE BAKER and MESSRS. ASSOCIATE JUSTICES FISHBURNE, STUKES, TAYLOR and OXNER concur.