STATE OF HAWAII *v.* FAUSTINO ABELLANO, ET AL.

No. 4705.

MAY 23, 1968.

RICHARDSON, C.J., MIZUHA, MARUMOTO, ABE AND LEVINSON, JJ.

OPINION OF THE COURT BY ABE, J.

The thirteen defendants-appellees were arrested on August 1, 1965 for violating section 13-3.1 of the Revised Ordinances of the City and County of Honolulu, 1961.[1] The State charged that defendants:

> did engage or participate in, or were present at, a cockfight exhibition . . . .

Although they were formally charged with participating, apparently the defendants did no more than be present at a place where a cockfight was being held. A district magistrate granted the defendants' motion to dismiss on the grounds that the ordinance is:

> null and void as being in conflict with State statute [and] unconstitutionally and unreasonably infringes upon a person's freedom of locomotion and movement.

The State appealed.

---

[1]Section 13-3.1 provides:

It shall be unlawful for any person to engage or participate in or to be present at, any cockfighting exhibition.

We affirm the dismissal. We do not reach the question whether state legislation in the area pre-empted the field.

A fundamental aspect of the somewhat amorphous concept of due process of law is that a penal statute must state with reasonable clarity the acts it proscribes. *Territory* v. *Naumu,* 43 Haw. 66 (1958); *Territory* v. *Anduha,* 31 Haw. 459 (1930), *aff'd* 48 F.2d 171 (9th Cir. 1931). A criminal statute is unconstitutional if it is not

> sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties . . . . And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law. *Connally* v. *General Const. Co.,* 269 U.S. 385, 391 (1926).

In determining whether the standard of being "present at" a cockfight is unconstitutionally vague, we are met at the outset with this court's ruling in *Territory* v. *Wong,* 40 Haw. 257 (1953). There the court sustained against the claim of unconstitutional vagueness a statute which made it unlawful to be "present" where a gambling game was being played. The court construed the word present to mean intentional presence with knowledge that a gambling game was going on. It set out orbits of nearness and determined whether persons within each orbit were present as that term was used in the statute. While recognizing that the applicability of the statute remained dubious in many situations, it concluded that the statute as construed was not constitutionally defective for vagueness.

We overrule *Territory* v. *Wong.* The court went too far in attempting to sustain the statute. The judicial power to hold a legislative enactment unconstitutional should be exercised prudently and with restraint. But this does not mean that the legislature can avoid the constitutional mandate to state clearly the acts proscribed and then expect a court to narrow the overly broad terms it selected. The mere fact that marginal cases are conceivable does not, of course, justify a court in holding a statute unconstitutional. *United States* v. *Harriss,* 347 U.S. 612, 618

(1954); *United States* v. *Petrillo,* 332 U.S. 1, 7 (1947). Scrutinizing the *Wong* opinion convinces us that even the court's ingenious construction of "present at" left more than marginal cases hanging in the balance.

An ordinance or statute proscribing presence, whether at a cockfight, a gambling game, or a house of prostitution, is too vague to satisfy the requirements of due process. Primarily, the term presence has a spacio-physical frame of reference. Unless the activity at which presence is unlawful is in a narrowly confined place, determination of what constitutes presence at the activity can be resolved only on the basis of policy. Setting such policy is a legislative function. The legislative body has failed to make clear its policy determination. For this court to attempt to rewrite the ordinance to cure the constitutional defect would be an unconstitutional exercise of legislative power.

Affirmed.

*John A. Radway, Jr.,* Deputy Prosecuting Attorney *(John H. Peters,* Prosecuting Attorney, and *T. Irving Chang,* Deputy Prosecuting Attorney, with him on the briefs) for plaintiff-appellant.

*John C. Lanham* for defendants-appellees.

---

CONCURRING OPINION OF LEVINSON, J.
IN WHICH RICHARDSON, C.J. JOINS.

I agree with the majority opinion that the ordinance is unconstitutionally vague, thereby violating the due process clause of the Fourteenth Amendment to the Constitution of the United States and the due process clause of Article 1, Section 4 of the Constitution of the State of Hawaii. I also agree that *Territory* v. *Wong,* 40 Haw. 257 (1953) should be overruled. But the majority opinion ignores the fact that the ordinance, which proscribes "presence", also violates the Ninth Amendment to the Federal Constitution and Article 1, Section 2 of the State Constitution.

The appellees argued that the ordinance infringes on their constitutionally guaranteed freedom of movement. I think it is

time to recognize that the United States and Hawaii Constitutions protect against such infringement. Freedom of movement is a vital aspect of the right of privacy which must be recognized if we are to preserve individual freedom.

Although the Federal Constitution does not refer to a general right of privacy or freedom of movement, both have been long and consistently recognized as adjuncts of specific constitutional provisions. *Griswold* v. *Connecticut,* 381 U.S. 479 (1965); *Kent* v. *Dulles,* 357 U.S. 116 (1958); *Williams* v. *Fears,* 179 U.S. 270 (1900); *Crandall* v. *Nevada,* 73 U.S. (6 Wall.) 35 (1867). Furthermore, the Constitution has been held to protect other rights not specifically mentioned, *Pierce* v. *Society of Sisters,* 268 U.S. 510 (1925); *Meyer* v. *Nebraska,* 262 U.S. 390 (1923).

Most recently, in *Griswold* v. *Connecticut,* 381 U.S. 479 (1965), the Court, with only one justice dissenting, recognized a constitutional right to marital privacy which a state could not invade by a law prohibiting the use of contraceptives. Unfortunately, the majority and concurring opinions disagreed as to the constitutional source of that right. Justice Douglas' opinion for the Court concluded that the "specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance." 381 U.S. at 484. Justice Goldberg's concurring opinion concludes that the Ninth Amendment

lends strong support to the view that the "liberty" protected by the Fifth and Fourteenth Amendments from infringement by the Federal Government or the States is not restricted to rights specifically mentioned in the first eight amendments. 381 U.S. at 493.

Justices Harlan and White, in separate concurring opinions, applied the flexible due process approach of the Fourteenth Amendment and found the right to marital privacy fundamental.

Despite the disagreement over the proper approach, it is clear that a majority of the United States Supreme Court has recognized a right of privacy as fundamental.[1] Concededly the privacy pro-

---

[1]The opinions have been interpreted as expressing a wide variety of fundamental approaches. Justice Douglas' approach has been criticized as providing

tected under *Griswold* is marital privacy. But the various opinions point the way toward an expanding constitutional right of privacy, as a necessary check on society's increasing demands for the subordination of the individual to a highly technological and computerized society.

When faced with the assertion of a constitutional right not previously recognized either in judicial opinions or enumerated in the Constitution, a court must determine the answers to two preliminary questions. First, precisely what is the nature of the right asserted? Second, where in the Constitution is the right guaranteed?

The precise nature of the right the appellees assert is one basic to all free men. Freedom is meaningless if it does not include the right to move from place to place during the course of a day, to stand in an open field, to visit a friend's home, to sit and listen to a lecture or participate in a discussion. The appellees do not assert that they were exercising a First Amendment freedom or that their First Amendment freedoms will be curtailed by application of the ordinance to their conduct. The right they as-

---

little basis for constitutional stability. McKay, *The Right of Privacy: Emanations and Intimations,* 64 Mich. L. Rev. 259, 267 (1965) . Despite Justice Douglas' attempt to tie the developing rights to specific provisions in the first eight amendments, precisely how far a court can go in building on specific provisions remains a conundrum. Another commentator described the opinion as one

> which roams through the Bill of Rights picking up a letter here and another there to spell out the new right . . . Dixon, *The Griswold Penumbra: Constitutional Charter For An Expanded Law of Privacy?*, 64 Mich. L. Rev. 197, 205-06 (1965) .

He concluded, however, that the breadth and uncertainty is a virtue, leaving opportunity "for continued probing and refinement of the privacy principle," *supra* at 206. Justice Douglas' opinion also has been construed as applying the flexible due process approach, Kauper, *Penumbras, Peripheries, Emanations, Things Fundamental and Things Forgotten: The Griswold Case,* 64 Mich. L. Rev. 235, 252 (1965) , as well as adopting the civil law method of analogical reasoning from written text, Franklin, *The Ninth Amendment As Civil Law Method and Its Implications for Republican Form of Government: Griswold v. Connecticut; South Carolina v. Katzenbach,* 40 Tul. L. Rev. 487 (1966) .

Justice Goldberg's opinion, relying in part on the Ninth Amendment, has been observed to bear a pronounced resemblance to the flexible due process approach. McKay, at 270.

The difficulties with the flexible due process approach have long been articulated. Adamson v. California, 332 U.S. 46, 68 (1947) (Black, J. dissenting) . *See also,* Griswold v. Connecticut, 381 U.S. 479, 511-18 (1965) (Black, J. dissenting) .

sert is completely independent of any other constitutionally protected rights.

Freedom of movement is a species of the general right to be let alone so basic to a free society and so well articulated by Justice Brandeis:

> The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men. *Olmstead* v. *United States,* 277 U.S. 438, 478 (1928) (dissenting).

It would be folly of the greatest magnitude to underestimate, in its many manifestations, the importance to a free society of the right of privacy. Privacy, as a basic aspect of liberty, is an attempt

> to do more than maintain a posture of self-respecting independence toward other men; it seeks to erect an unbreachable wall of dignity and reserve against the entire world. Rossiter, *The Pattern of Liberty,* in Aspects of Liberty 17 (Konvitz and Rossiter 1958).

The source of protection for a right of privacy in the Constitution has not been determined by a majority of the Supreme Court, *see Griswold* v. *Connecticut,* 381 U.S. 479 (1965). After analyzing the historical and logical arguments, the plain language, and the inherent nature of the Federal Constitution, I would conclude that a general right of privacy is one of those protected under the Ninth Amendment, that the Ninth Amendment may well be "the cornerstone of the Constitution" in years to come, Patterson, *The Forgotten Ninth Amendment* 1 (1955).[2] The Ninth Amendment declares:

---

[2]Little was written on the significance of the Ninth Amendment before Griswold. Since the Court decided that case, however, the arguments on the

> The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.

Historically, it was included to nullify the argument that the enumerated rights were intended to be the only rights protected.[3] Therefore, to reject the Ninth Amendment as a source of substantive rights would be to accept the precise argument it was intended to nullify.

As for its applicability to the states, by definition, the rights protected by the Ninth Amendment are those fundamental to a free society and therefore are included in the Fourteenth Amendment.[4] The Ninth Amendment is a reservoir of personal rights necessary to preserve the dignity and existence of man in a free society. I have found no approach which provides greater certainty without sacrificing the flexibility requisite to making the Constitution a pillar of cloud by day and a pillar of fire by night to guide us in the continuing quest for optimum individual freedom.

Recognition of unenumerated rights, whether under the Ninth Amendment or the due process clause of the Fourteenth Amendment, has been severely criticized.[5] To Justice Black, both

---

use of that amendment to protect unenumerated substantive rights have been clearly articulated. *Compare* Redlich, Are There "Certain Rights . . . Retained by the People"?, 37 N.Y.U. L. Rev. 787 (1962) , *with* Kauper, *supra* note 1.

[3]Although disagreeing on the significance of the Ninth Amendment, there is little disagreement as to the purpose of including it. *See* Dunbar, *James Madison and the Ninth Amendment*, 42 Va. L. Rev. 627, 631, 635 (1956) ; Patterson, *The Forgotten Ninth Amendment* 9-10 (1955) .

[4]One commentator has suggested that the Ninth Amendment was directly applicable to the states, Patterson, *supra* note 3, at 34. The arguments against direct application and in favor of absorption through the Fourteenth Amendment seem far more persuasive, Kauper, *supra* note 1, at 255; Redlich, *supra* note 2, at 805-08.

[5]Dissenting in Adamson v. California, 332 U.S. 46, 82-84 (1947) , Justice Black articulated his basic objection to a flexible due process approach in terms not dissimilar from those he used in his dissent in Griswold.

> Thus the power of legislatures became what this Court would declare it to be at a particular time independently of the specific guarantees of the Bill of Rights. 332 U.S. at 83.

He would recognize a right of privacy only insofar as a specific constitutional provision restrains government action. Only in this way, he argues, can security from judicial usurpation of the legislative function be achieved, 381 U.S. at 507.

these approaches

> require judges to determine what is or is not constitutional on the basis of their own appraisal of what laws are unwise or unnecessary. *Griswold* v. *Connecticut,* 381 U.S. 479, 511-12 (dissenting).

I cannot accept the argument Justice Black has so artfully articulated against the use of any provision in the Constitution to protect unenumerated rights for three reasons.

First, although I am aware of the past use of the due process clause of the Fourteenth Amendment to substitute the Court's conclusion as to the wisdom of social or economic legislation for the legislature's, I am also aware of the profound recognition of the error of that approach.[6] In the twenty years since the Court struck down New Deal legislation, the Court has time and again recognized that:

> The doctrine that prevailed in *Lochner, Coppage, Adkins, Burns,* and like cases—that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely—has long since been discarded. We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws. *Ferguson* v. *Skrupa,* 372 U.S. 726, 730 (1963).[7]

---

Indeed, Justice Harlan tempered his opinion, in Griswold, most likely with a view to Justice Black's dissent, with the statement that:

> It [judicial self-restraint] will be achieved in this area [of due process], as in other constitutional areas, only by continual insistence upon respect for the teachings of history, solid recognition of the basic values that underlie our society, and wise appreciation of the great roles that the doctrines of federalism and separation of powers have played in establishing and preserving American freedoms. 381 U.S. at 501.

[6] Of course, the last twenty years of judicial restraint have not completely erased the judicial experience with early social and economic legislation. It remains true today that:

> To suggest that people have judicially enforceable rights other than those specifically enumerated in the Constitution raises for many the spectre of conservative jurists striking down regulatory legislation under the banner of "freedom of contract." Redlich, *supra* note 2, at 794.

[7] Indeed, Justice Douglas reaffirmed this conclusion in his opinion for the Court in Griswold.

> We do not sit as a super-legislature to determine the wisdom, need, and propriety of laws that touch economic problems, business affairs, or social conditions. 381 U.S. at 482.

It is always possible that a majority of the Court in the future might repudiate this philosophy.[8] But a majority which would ignore the last twenty years in reverting to the *Lochner* analysis would not be deterred by holdings that only enumerated rights were entitled to constitutional protection. The possibility that courts might abuse their power is a spurious basis for declining to exercise the power correctly.

Second, the argument fails to distinguish between recognition of a constitutional right and the standard employed in determining the constitutionality of legislation infringing on the right.[9] In abandoning *Lochner,* the Court has not declined to recognize that freedom of contract and the right to property are constitutionally protected. It simply has determined that when a legislative enactment is alleged to infringe on those rights, the Constitution requires no more than that the legislative purpose be one within the legislature's powers and that the means selected to achieve the purpose bear a reasonable relation to that end, *Ferguson* v. *Skrupa,* 372 U.S. 726 (1963). In cases involving First Amendment freedoms, a more stringent test is applied. *NAACP* v. *Button,* 371 U.S. 415 (1963) .

Third, and by far most important, to refuse to recognize the efficacy of the Constitution to meet the challenge of modern society would be to ignore Chief Justice Marshall's admonition that "we must never forget, that it is a *constitution* we are expounding", *M'Culloch* v. *Maryland,* 17 U.S. (4 Wheat.) 316, 407 (1819) . It is fundamental error to argue that the framers believed their subjective intentions were to control the construction of the Constitution in the centuries to come.[10] They drafted and adopted a constitution

> intended to endure for ages to come, and, consequently, to be adapted to the various *crises* for human affairs . . . 17 U.S. (4 Wheat.) at 415.

Their aim was to construct a document:

> to approach immortality as nearly as human institutions can

---

[8]McKay, *supra* note 1, at 271. *See also* Hand, *The Bill of Rights* 46 (1958) .

[9]Kauper, *supra* note 1, at 258.

[10]Cahn, *Confronting Injustice* 49 (1966) .

approach it. *Cohens* v. *Virginia*, 19 U.S. (6 Wheat.) 264, 387 (1821).

The framers were men with great insight and wrote flexibility into the great document. The rights they enumerated in the first eight amendments were the rights which they had most often been denied.[11] The Ninth Amendment is the place to which we must turn for protection of individual liberty from infringements not enumerated, and perhaps not contemplated, by the founding fathers.[12]

The Constitution of the United States has lasted more than 180 years. Few written constitutions drafted in the mid-seventeenth century lasted anywhere near that length of time. Such longevity is due to a basic shift in the attitude toward constitutions which the framers brought to Philadelphia in 1787. To survive, a constitution must be efficacious rather than perpetual, adaptable rather than immutable, and enforced by appeal to the courts rather than by appeal to heaven.[13] Article V, providing for formal amendment, was not the only provision in the Constitution for flexibility.

> The slow and cumbersome mechanism of Article V can at most produce a needed change in the literal text of the Constitution; the goal of adaptation requires more than that, the goal of efficacy requires considerably more. How can we discover just what the broad, sweeping phrases of the text signify as concrete legal mandates unless they should be interpreted by some authoritative organ? How can their meaning reflect the shift and flux of social conditions, economic interests, and political ideals unless the organ which interprets should likewise be equipped to reinterpret? Cahn, *Confronting Injustice* 75 (1966).

To place decisive weight on the need for certainty, particularly

---

[11]Hand, *supra* note 8, at 65.

[12]When the well thought out formulae of the past fail to provide the answer to a case which raises issues of such fundamental importance, perhaps it is time to pause and look for fresh concepts. Redlich, *supra* note 2, at 795.

[13]Cahn, *supra* note 10, at 67-68.

when based on the intention of the framers, is not only erroneous but also an attempt to place on the courts an impossible burden.[14]

I do not suggest that the right to be let alone and to be where one chooses is an absolute right.[15] The infringement in this case may not appear great. The crime charged is not one tending to devastate society.[16] But the relative unimportance of a crime or slight nature of the penalty imposed cannot diminish the potential threat from permitting the law-making body to make "presence" a crime.

> [U]nconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. *Boyd* v. *United States,* 116 U.S. 616, 635 (1886).

The standard to be used in testing the constitutionality of a statute infringing on the right of privacy should depend on the precise aspect of privacy invaded. Where the aspect of privacy

---

[14]The difficulties inherent in determining the "intention" of the legislature or legislators are well-recognized, Hand, *supra* note 8, at 19. For an excellent discussion of the even greater difficulties in using history as a guide in constitutional interpretation, *see* Wofford, *The Blinding Light: The Uses of History in Constitutional Interpretation,* 31 U. Chi. L. Rev. 502 (1964).

Even were it possible to discover what they intended, construing the Constitution on such basis is to misapprehend the nature of a constitution.

If Jefferson could advise us today, he would be the first to insist that we in the twentieth century are not bound by anything he may have intended in the eighteenth. To the end of his life, he reiterated boldly that the Constitution belongs not to the dead but to every successive generation of living Americans. *This has been the very life of the Constitution.* To agree now with what Jefferson or Madison may have intended or may have communicated to the First Congress is only a comfort, not an obligation. Cahn, *supra* note 10, at 49 (emphasis added).

*But see,* Ex Parte Bain, 121 U.S. 1, 12 (1887).

[15]Health quarantine laws have long been upheld, Compagnie Francaise & Co. v. Board of Health, 186 U.S. 380 (1902). Military security has been held to justify placing an area of a river off limits for a limited period of time to prevent interference with the launching of a submarine by anti-war demonstrators, United States v. Aarons, 310 F.2d 341 (2d Cir. 1962).

[16]Indeed, the areas in which protection of the right of privacy is likely to have its greatest range in protecting the individual do not involve criminal conduct. *Cf.,* Handler and Rosenheim, *Privacy in Welfare: Public Assistance and Juvenile Justice,* 31 Law & Cont. Prob. 377 (1966); Karst, *"The Files": Legal Controls Over the Accuracy and Accessibility of Stored Personal Data,* 31 Law & Cont. Prob. 342 (1966); Reich, *Midnight Welfare Searches and the Social Security Act,* 72 Yale L.J. 1347 (1963). *Compare,* McKay, *Self-incrimination and the New Privacy,* 1967 Sup. Ct. Rev. 193 (1967).

asserted is analogous to the right of property or contract, a lesser standard, similar to the rationality test of substantive due process, should suffice. But where, as here, the aspect of privacy involved is a constituent element in the definition of freedom, only the more stringent compelling interest-narrow specificity standard will suffice.[17] When a state infringes on an individual's freedom of movement, under the guise of the "curiously inept phrase 'Police Power' ", Hand, *supra* note 8, at 40, the court must scrutinize the purpose of the legislation and the alternatives which may exist to achieve the purpose.

The anti-cockfight ordinance is aimed at preventing cruelty to animals. Such legislation is a proper subject of the police power. Looking, however, to the sweeping infringement on the freedom of movement and privacy, I think that the ordinance goes further than reasonably necessary to achieve its purpose. Making it a crime "to engage or participate in" a cockfight provides an effective basis for enforcing a policy against cruelty to animals without unnecessarily infringing on freedom of movement, particularly when considered in connection with the state statute on the subject.[18]

The Hawaii Constitution guarantees the right to life, liberty, and the pursuit of happiness, Article 1, Section 2. Even if the Federal Constitution does not protect the freedom of movement involved in this case, I think that the pursuit of happiness clearly

---

[17]"Where fundamental personal liberties are involved,
the State may prevail only upon showing a *subordinating interest which is compelling*. Bates v. Little Rock, 361 U.S. 516, 524 (1960) (emphasis added).
But even where the state establishes a compelling interest,
that purpose cannot be pursued by means that *broadly stifle fundamental personal liberties* when the end *can be more narrowly achieved*. Shelton v. Tucker, 364 U.S. 479, 488 (1960) (emphasis added).
This compelling interest-narrow specificity test has been applied increasingly to protect personal liberty. NAACP v. Alabama, 377 U.S. 288 (1964); Gibson v. Florida Legislative Investigation Comm., 372 U.S. 539 (1963); NAACP v. Button, 371 U.S. 415 (1963).

[18]R.L.H. 1955, § 262-3 provides as follows:
Any person who keeps or uses, or in any way is connected with or interested in the management of, or receives money for the admission of any person to, any place kept or used for the purpose of fighting or baiting any bull, bear, dog, cock or other creature, and every person who encourages, aids or assists therein, or who permits or suffers any place to be so kept or used, is guilty of a misdemeanor.

includes the right to move about and linger in the community, observing the actions of others therein. An opinion of this court many years ago declaring unconstitutional a broad anti-loitering statute perhaps best articulated what is involved.

Visitors, lured by the fame of our climate and of our natural scenery and the hospitality of our people, come here for recreation and pleasure. Many of them, having no other occupation, habitually but harmlessly idle or loiter upon our streets and highways. In their pursuit of happiness, which is a guaranteed right, they loiter before shop windows, pause to enjoy the changing colors of the ocean and to talk with friends. it would be shocking to say that so long as they are innocent of any wrong and conduct themselves with due regard to the rights of others and the good order of the community the legislature has the constitutional authority to declare them misdemeanants and subject them to arrest and imprisonment. *Territory* v. *Anduha,* 31 Haw. 459, 461 (1930) . *aff'd* 48 F.2d 171 (9th Cir. 1931) .