**Vincent COPELAND, Plaintiff,**

v.

**The SECRETARY OF STATE, Defendant.**

United States District Court
S. D. New York.

Jan. 23, 1964.

Leonard B. Boudin, Rabinowitz & Boudin, New York City, for plaintiff.

Robert M. Morgenthau, U. S. Atty., S.D.N.Y. (Robert E. Kushner, Asst. U. S. Atty., S.D.N.Y., Eugene R. Anderson, Asst. U. S. Atty., S.D.N.Y., and Benjamin C. Flanagan, Atty., Dept of Justice, of counsel), for defendant.

Before HAYS, Circuit Judge, and McGOHEY and EDELSTEIN, District Judges, sitting as a statutory court.

EDELSTEIN, District Judge.

Section 6 of the Subversive Activities Control Act, Title I of the Internal Security Act of 1950, 64 Stat. 993, 50 U.S.

C.A. § 785 ("Act") provides that when an order of the Subversive Activities Control Board ("Board") requiring a Communist organization to register has become final, it shall be unlawful for a member of such a Communist organization, having knowledge of its registration, to apply for a passport. The Act also makes it unlawful for a passport officer with knowledge that an applicant is a member of such an organization to issue or renew a passport to such person.[1] The action of the Board in ordering the Communist Party of the United States to register as a Communist-action organization was upheld, after marathon litigation, in Communist Party of United States v. Subversive Activities Control Board, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed. 2d 625 (1961).[2] The Communist Party case sustained the constitutionality of the registration provisions of the Act, 50 U.S.C.A. § 786 and the Board's registration order became final on October 20, 1961. The finality of the order brought § 6 of the Act, the passport provision, into play.[3]

The defendant Secretary of State has been granted the statutory authority to "grant, issue and verify passports", 22 U.S.C.A. § 211a[4] and on April 12, 1962,

1. **"§ 785. Denial of passports to members of Communist organizations**

 "(a) When a Communist organization as defined in paragraph (5) of section 782 of this title is registered, or there is in effect a final order of the Board requiring such organization to register, it shall be unlawful for any member of such organization, with knowledge or notice that such organization is so registered or that such order has become final—

 "(1) to make application for a passport, or the renewal of a passport, to be issued or renewed by or under the authority of the United States; or

 "(2) to use or attempt to use any such passport.

 "(b) When an organization is registered, or there is in effect a final order of the Board requiring an organization to register, as a Communist-action organization, it shall be unlawful for any officer or employee of the United States to issue a passport to, or renew the passport of, any individual knowing or having reason to believe that such individual is a member of such organization."

 The regulatory portion of this statute is supplemented by the penalty provisions of 50 U.S.C. § 794. Section 794 provides that any individual convicted of a violation of § 785 shall "be punished for each such violation by a fine of not more than $10,000 or by imprisonment for not more than five years, or by both such fine and imprisonment."

2. For a detailed summary of the long history of this litigation, see Communist Party of the United States v. Subversive Activities Control Board, 367 U.S. 1, 19–22, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961). On November 22, 1950, the Attorney General petitioned the Subversive Activities Control Board for an order to require that the Communist Party register as a Communist-action organization. The order of the Board did not become final until October 20, 1961, after the decision in the Communist Party case, supra (June 5, 1961). In the intervening years the hearings on the Attorney General's petition and on the registration provisions involved the courts in the following decisions: Communist Party of United States of America v. McGrath, 96 F.Supp. 47 (D.C.1951); (three judge court); Communist Party of United States v. Subversive Activities Control Board, 96 U.S.App.D.C. 66, 223 F.2d 531 (1954); 351 U.S. 115, 76 S.Ct. 663, 100 L.Ed. 1003 (1956); 102 U.S.App.D.C. 395, 254 F.2d 314 (1958); 107 U.S.App. D.C. 279, 277 F.2d 78 (1959). The Communist Party is still the only organization that is under an order to register. The National Council of American-Soviet Friendship, Inc. was ordered to register as a Communist-front organization but the Board's order was reversed. See National Council of American-Soviet Friendship Inc. v. Subversive Activities Control Board, 322 F.2d 375 (D.C.Cir. 1963).

3. The Board's order was published in the Federal Register on that date thereby constituting notice to all members of such organization that such order has become final. § 13(k) of the Subversive Activities Control Act of 1950, 50 U.S.C.A. § 792; 26 FED.REG. 9923.

4. 22 U.S.C.A. § 211a provides: Authority to grant, issue and verify passports.

 "The Secretary of State may grant and issue passports, and cause passports to be granted, issued, and verified in foreign countries by diplomatic representatives of the United States, and by such consul generals, consuls, or vice consuls when in charge, as the Secretary of State may

Copeland filed an application with the Secretary for a passport to travel to Europe. Because Copeland refused to execute what is commonly referred to as a non-Communist affidavit, which the Secretary pursuant to 22 C.F.R. § 51.135 (Supp.1963) [5] requires of all applicants, the Secretary of State declined to process the application and refused to issue him a passport. The Secretary's justification for his inaction was based on the ground that the non-Communist statement "is considered a matter of fact which is material to the determination of an applicant's entitlement to passport facilities." [6] Copeland's failure to supply a statement which the Secretary deemed to be a procedure essential to the implementation of his substantive power under the passport statute, rendered the application incomplete and no further action was taken by the Secretary. Thereupon, this suit was brought.

The complaint herein challenges the constitutionality of Section 6 of the Act, 50 U.S.C.A. § 785, and contests the defendant Secretary's substantive power to require a passport applicant to furnish information with respect to Communist Party membership. The complaint seeks the following forms of relief: a declaratory judgment that 50 U.S.C.A. § 785 is unconstitutional, an injunction restraining the defendant from enforcing and executing the statute against plaintiff because of the statute's "repugnance to the United States Constitution" and an order directing the Secretary to issue a passport to plaintiff. Plaintiff subsequently moved for summary judgment which was met, in due course, by the defendant's cross motion to dismiss the complaint for failure to state a claim upon which relief can be granted, or, in the alternative, summary judgment. See Fed.R.Civ.P. 12(b) (6); 56(c).

■ Plaintiff's prayer for an injunction restraining the enforcement of a Federal statute necessitated the convening of a three-judge court since these cross motions raised a substantial constitutional question as to whether the Secretary's inquiry into applicant's Communist Party membership was relevant to the exercise of a valid substantive power upon which the Secretary could properly refuse to issue a passport. See Briehl v. Dulles, 101 U.S.App.D.C. 239, 248 F.2d 561, 577 (1957) (concurring opinion); rev'd. sub. nom., Kent v. Dulles, 357 U.S. 116, 131, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958) (Clark, J., dissenting opinion); Schneider v. Rusk, 372 U.S. 224, 225, 83 S.Ct. 621, 9 L.Ed.2d 695 (1963); Communist Party v. Subversive Activities Control Board, supra 367 U.S. at 70, 81, 81 S.Ct. at 1396–1397, 1402, 6 L.Ed.2d 625; Mayer v. Rusk, D.C.D.C., 1963, 224 F.Supp. 929. See 28 U.S.C. § 2282 (1952).[7]

designate, and by the chief or other executive officer of the insular possessions of the United States, under such rules as the President shall designate and prescribe for and on behalf of the United States, and no other person shall grant, issue, or verify such passports."

5. 22 C.F.R. § 51.135, as revised, provides: Denial of passports to members of Communist organizations.

"A passport shall not be issued to, or renewed for, any individual who the issuing officer knows or has reason to believe is a member of a Communist organization registered or required to be registered under section 7 of the Subversive Activities Control Act of 1950, as amended (50 U.S.C. Sec. 786)."

22 C.F.R. § 51.74 provides:

"Affidavits. Any affidavit which may be required under the rules in this part or shall be submitted in support of an application for a passport or the renewal, extension, or amendment of a passport shall be considered as, and become, a part of the application."

22 C.F.R. § 51.77 provides:

"The Secretary of State is authorized to make regulations on the subject of issuing, renewing, extending, amending, restricting, or withdrawing passports additional to the rules in this part and not inconsistent therewith."

6. Letter from Edward J. Hickey, Deputy Director, Passport Office, to plaintiff's counsel, May 28, 1963.

7. 28 U.S.C. § 2282 provides: Injunction against enforcement of Federal statute: three judge court required.

"An interlocutory or permanent injunction restraining the enforcement, opera-

The following material facts essential to the disposition of the important legal questions posited by these cross motions are not in dispute:

Vincent Copeland is an American citizen who resides in the Southern District of New York. In applying for a passport to travel to Europe Copeland executed the standard passport application on the most recent form required by the Secretary of State. See 22 U.S.C.A. § 213; 22 C.F.R. § 51.14; 22 C.F.R. § 51.134.[8] The passport application form, DSP–11 (Government Exhibit A) is in the form of a factual statement to be signed by the applicant. It commences with "I, (name of applicant), a citizen of the United States, do hereby apply to the Department of State for a passport" on the first page and runs through to the signature on the second page. The application calls for answers to such routine questions as birthplace, birth date, occupation, residence, travel plans and means of transportation. At the end of the second page, after the routine questions are completed, there is a lengthy statement which must be sworn to by the applicant. The statement on the application, reproduced below,[9] begins with "I have not (and no other person to be included in the passport has) since acquir-

tion or execution of any Act of Congress for repugnance to the Constitution of the United States shall not be granted by any district court or judge thereof unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."

8. 22 U.S.C.A. § 213 provides: Application for passport; fees for taking.

"Before a passport is issued to any person by or under authority of the United States such person shall subscribe to and submit a written application duly verified by his oath before a person authorized and empowered to administer oaths, which said application shall contain a true recital of each and every matter of fact which may be required by law or by any rules authorized by law to be stated as a prerequisite to the issuance of any such passport."

22 C.F.R. § 51.14 provides: Applications for Passports. Contents of Application.

"Before a passport is issued to any person by or under the authority of the United States, such person shall subscribe to and submit a written application duly verified by his oath before a person authorized and empowered to administer oaths, and each application shall contain a true recital of each and every matter of fact, which may be required by law, or by any rules authorized by law, to be stated as a prerequisite to the issuance of any such passport."

22 C.F.R. § 51.134 provides: Applications to be made out completely on most recent forms.

"Application for passports should be made on the most recent form or forms prepared by the Department of State and should contain complete information called for in such form or forms."

9. "I have not (and no other person to be included in the passport has), since acquiring United States citizenship, been naturalized as a citizen of a foreign state; taken an oath or made an affirmation or other formal declaration of allegiance to a foreign state; entered or served in the armed forces of a foreign state; accepted or performed the duties of any office, post, or employment under the government of a foreign state or political subdivision thereof; voted in a political election in a foreign state or participated in an election or plebiscite to determine the sovereignty over foreign territory; made a formal renunciation of nationality either in the United States or before a diplomatic or consular officer of the United States in a foreign state; ever sought or claimed the benefits of the nationality of any foreign state; been convicted by a court or court martial of competent jurisdiction of committing any act of treason against, or attempting by force to overthrow, or bearing arms against, the United States, or conspiring to overthrow, put down or to destroy by force, the Government of the United States; or departed from or remained outside of the jurisdiction of the United States for the purpose of evading or avoiding training and service in the military, air or naval forces of the United States, and I am not and have not been at any time during the period of 12 full calendar months preceding the date of this application (and no other person to be included in the passport is or has been at any time during the said period) a member of any organization registered or required to register as a Communist organization under Section 7 of the Subversive Activities Control Act of 1950, as amended. (50 U.S.C. 786)."

ing United States citizenship been naturalized as a citizen of a foreign state, etc. * * * " The statement goes on to describe activities which, if engaged in, may lead to loss of citizenship and the right to United States passport facilities, i. e., voting in a national election of a foreign state; claiming the benefits of the nationality of a foreign state; service in the armed forces of a foreign state; or oath or affirmation or formal declaration of allegiance to a foreign state, etc. See Marks v. Esperdy, 315 F.2d 673 (2d Cir. 1963), cert. granted, 375 U.S. 810, 84 S.Ct. 66, 11 L.Ed.2d 47 (1963). But see Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). The last clause of the declaration contains the following factual statement:

" * * * and I am not and have not been at any time during the period of 12 full calendar months preceding the date of this application (and no other person to be included in the passport is or has been at any time during the said period) a member of any organization registered or required to register as a Communist organization under Section 7 of the Subversive Activities Control Act of 1950, as amended (50 U.S.C. § 786)."

This non-Communist affidavit was made part of the revised passport form subsequent to the Secretary's promulgation, on January 12, 1962, of revised passport regulations. Department of State Passport Reg. 22 C.F.R. §§ 51.135–51.170 (Supp.1963); 27 Fed.Reg. 344 (1962). These regulations were promulgated pursuant to the Secretary's authority to grant and issue passports and his ancillary power to promulgate such regulations "as may be necessary to carry out the functions * * * vested in [him] * * * " 5 U.S.C.A. § 151c; 22 C.F.R. § 51.77. See 22 C.F.R. § 51.-135—§ 51.170 (Supp.1963). The most significant of the revised regulations, at least for the present action, is § 51.135, 22 C.F.R. § 51.135, which provides that a passport shall not be issued to or renewed "for any individual who the issuing officer knows or has reason to believe is a member of a Communist organization registered or required to be registered under Section 7 of the Subversive Activities Control Act of 1950, as amended (50 U.S.C. Sec. 786)." The precursor to Regulation § 51.135 [10] was invalidated by the Supreme Court in Kent v. Dulles, supra, which held that neither 22 U.S. C.A. § 211a, the passport statute, nor § 215 of the Immigration and Nationality

10. Prior to the revision by the Secretary in January 1962, § 51.135 of the Secretary's passport regulations read as follows:

"Limitations on issuance of passports to persons supporting Communist movement.

"In order to promote the national interest by assuring that persons who support the world Communist movement of which the Communist Party is an integral unit may not, through use of United States passports, further the purposes of that movement, no passport, except one limited for direct and immediate return to the United States, shall be issued to:

"(a) Persons who are members of the Communist Party or who have recently terminated such membership under such circumstances as to warrant the conclusion—not otherwise rebutted by the evidence—that they continue to act in fur-

therance of the interests and under the discipline of the Communist Party;

"(b) Persons, regardless of the formal state of their affiliation with the Communist Party, who engage in activities which support the Communist movement under such circumstances as to warrant the conclusion—not otherwise rebutted by the evidence—that they have engaged in such activities as a result of direction, domination, or control exercised over them by the Communist movement;

"(c) Persons, regardless of the formal state of their affiliation with the Communist Party, as to whom there is reason to believe, on the balance of all the evidence, that they are going abroad to engage in activities which will advance the Communist movement for the purpose, knowingly and wilfully of advancing that movement."

Act, 8 U.S.C.A. § 1185 [11] provided the Secretary with statutory authority to curtail in his discretion the free movement of citizens in order to satisfy himself about their Communist beliefs or associations. Hence, after Kent, the "old" § 51.135 was rendered obsolete. Since the Court stated that Communist membership or activities was not available as a standard for denying passport facilities the statutory underpinning was removed from beneath the regulations, and the regulations, consequently, could not be applied to control the foreign travel of Communist Party members.

This statutory void was filled when § 6 of the Subversive Activities Control Act, 50 U.S.C.A. § 785, became effective on October 20, 1961. Section 6 is an explicit grant of statutory authority to deny passports to those members of a Communist organization that is registered or ordered to register under the Act. The non-Communist affidavit's reference to 50 U.S.C.A. § 786 indicates the Secretary's reliance on § 7 of the Act, the registration provision, as the statutory foundation for the employment of the passport provisions of the Act as well as for the promulgation of the oath which is authorized by § 51.142 of the Regulations,[12] 22 C.F.R. § 142.

The passport application instructions contain the following explicit warning on page 4 at paragraph 6:

"WARNING"

"Section 6 of the Internal Security Act of 1950 (50 U.S.C. 785) prohibits application for or use of a passport by and issuance or renewal of a passport to a member of an organization registered or required to register as a Communist organization under Section 7 of the Act. The following organizations are registered or required to register under Section 7:

"The Communist Party of the United States of America."

Copeland filled in the application and made all the factual statements required

---

11. 8 U.S.C.A. § 1185 provides: "Travel control of citizens and aliens during war or national emergency—Restrictions and prohibitions on aliens

"(a) When the United States is at war or during the existence of any national emergency proclaimed by the President, or, as to aliens, whenever there exists a state of war between or among two or more states, and the President shall find that the interests of the United States require that restrictions and prohibitions in addition to those provided otherwise than by this section be imposed upon the departure of persons from and their entry into the United States, and shall make public proclamation thereof, it shall, until otherwise ordered by the President or the Congress, be unlawful— * * *

"Citizens

"(b) After such proclamations as is provided for in subsection (a) of this section has been made and published and while such proclamation is in force, it shall, except as otherwise provided by the President, and subject to such limitations and exceptions as the President may authorize and prescribe, be unlawful for any citizen of the United States to depart from or enter, or attempt to depart from or enter, the United States unless he bears a valid passport."

12. 22 C.F.R. § 51.142 provides: "Oath or affirmation by applicant as to membership in the Communist Party.

"At any stage in the proceedings in the Passport Division or before the Board, if it is deemed necessary, the applicant may be required, as a part of his application, to subscribe, under oath or affirmation, to a statement with respect to present or past membership in the Communist Party. If applicant states that he is a Communist, refusal of a passport in his case will be without further proceedings."

The Secretary's reliance on § 6 of the Act, 50 U.S.C.A. § 785 is supported by the affidavit of a former Assistant United States Attorney, formerly in charge of this matter. The pertinent portion of the affidavit dated July 9, 1963, reads as follows:

"Defendant, Secretary of State, concedes that the action of the defendant in refusing to process and consider the passport application of plaintiff, Vincent Copeland, in the form in which it was submitted and in refusing to issue a passport to him was predicated upon Section 6 of the Subversive Activities Control Act, Title 50, United States Code, Section 785."

by the application but one: he deleted[13] the portion of the affidavit relating to membership in an organization required to register under Section 7 of the Act. Mr. Copeland "attached and made a part of" his application, as required, an explanatory statement wherein he stated that his refusal to execute the non-Communist affidavit was not based on the fact that the condition of Communist Party membership applied to him but solely because a "matter of principle" compelled him to remain silent. He declared the principles upon which he relied by stating that "I believe that every American citizen has a natural right to travel, regardless of his political or economical views or associations, and because I believe that the restrictions on travel imposed by the McCarren [sic] Act are an unconstitutional interference with the Fifth [sic] amendment rights of freedom of speech and belief of association, and the Fifth Amendment protection of liberty." His reference to the McCarran Act was more accurately a reference to § 6 of the Subversive Activities Control Act of 1950, 50 U.S. C.A. § 785. The Secretary, as stated above, declined to take further action on the application because he deemed it incomplete as to facts material to a determination of Copeland's qualification for passport facilities.

Plaintiff has alleged in his complaint that Section 6 of the Act violates his First and Fifth Amendment rights, constitutes a bill of attainder, infringes his right to trial by jury and imposes cruel and unusual punishment. Only the First and Fifth Amendment claims and the bill of attainder contention were pressed in plaintiff's brief and on oral argument. No question has been raised as to whether the execution of the affidavit or the making of the explanatory statement would be violative of the Fifth Amendment right against compulsory self-incrimination.[14]

Because the Court is not unaware that. "[t]he three judge procedure is an extraordinary one, imposing a heavy burden on federal courts, with attendant expenses and delay;" and that it is a "procedure, designed for a specific class of cases, sharply defined, [which] should not be lightly extended," Oklahoma Gas & Elec. Co. v. Oklahoma Packing Co., 292. U.S. 386, 391, 54 S.Ct. 732, 734, 78 L.Ed. 1318 (1934); Osage Tribe of Indians v. Ickes, 45 F.Supp. 179 (D.C.D.C.1949), aff'd. per curiam, 77 U.S.App.D.C. 114, 133 F.2d 47 (1943), the Court regards. it important to dispel, at this liminal. stage, any misgivings that leave unanswered the question whether the issues. raised by plaintiff's contentions make out an appropriate case for the resort to this; extraordinary adjudicatory procedure.

 The three judge court procedure is not to be invoked on a "contingent. constitutional question." International Ladies Garment Workers Union v. Donnelly, 304 U.S. 243, 251, 58 S.Ct. 875, 82 L.Ed. 1316 (1938); Bauer v. Acheson,. 106 F.Supp. 445 (D.C.1952); McCain v.. Davis, 217 F.Supp. 661 (E.D.La.1963). Adjudication by a three judge court is. improper if the first issue to be reached: is one of statutory construction even. though perhaps the construction may eventually lead to a constitutional question. Kesler v. Department of Public Safety, 369 U.S. 153, 82 S.Ct. 807, 7 L. Ed.2d 641 (1962). The three judge procedure is, however, properly invoked: when an attack upon the validity of an: Act of Congress raises substantial constitutional questions concerning its validity. Jameson & Co. v. Morgenthau, 307 U.S. 171, 173, 59 S.Ct. 804, 83 L.Ed. 1189. (1939); California Water Service Co. v..

---

13. "(If any of the above-mentioned acts or conditions have been performed by or apply to the applicant, or to any other person to be included in the passport, the portion which applies should be struck out, and a supplementary explanatory statement under oath (or affirma-

tion) by the person to whom the portion is applicable should be attached and made a part of this application.)"

14. But see Communist Party v. United States, No. 17583, D.C.Cir., December 17,. 1963, 32 U.S.L.Week 2295 (D.C.Cir. December 17, 1963).

Redding, 304 U.S. 252, 254–255, 58 S.Ct. 865, 82 L.Ed. 1323 (1938). The attack must be upon an Act of Congress "or any part thereof," and not on Regulations or administrative action thereunder for "[i]t does not appear to have been the intention of Congress that direct appeal should lie to [the Supreme Court] when administrative action and not the Act of Congress is assailed." Jameson & Co. v. Morgenthau, supra, 307 U.S. at 173–174, 59 S.Ct. at 805, 83 L.Ed. 1189. The mere allegation in a complaint that an Act of Congress is under attack does not have the talismanic effect of requiring the convocation of the court. The plaintiff's claims must raise a substantial constitutional question that has not yet been passed upon by the Supreme Court. See Schneider v. Rusk, 372 U.S. 224–225, 83 S.Ct. 621, 9 L.Ed.2d 695 (1963).

The court finds that the prerequisites for the invocation of a three judge court are satisfied as the "important constitutional questions" not reached in Kent v. Dulles, supra, 357 U.S. at 130, 78 S.Ct. at 1120, 2 L.Ed.2d 1204, are properly at issue here.

Mr. Copeland, an American citizen, complains that his right to travel, which "is part of the 'liberty' of which the citizen cannot be deprived without due process of law under the Fifth Amendment," Kent v. Dulles, supra, 357 U.S. at 125, 78 S.Ct. at 1118, 2 L.Ed.2d 1204, has been denied him because of his refusal to divulge information concerning his beliefs and associations. The Secretary, in turn, has sought to inquire into the possibility of Copeland's Communist Party membership in order that he may properly exercise his statutory duty under § 6 to withhold passport privileges from Communist Party members. The significance of the constitutional question raised by the clash of these contentions was foreshadowed by the statement of the court in Kent v. Dulles: "We would be faced with important constitutional questions were we to hold that Congress * * * had given the Secretary authority to withhold passports to citizens because of their beliefs or associations." Id. 357 U.S. at 130, 78

S.Ct. at 1120, 2 L.Ed.2d 1204. And the manner in which the issue was framed in the dissent in Kent sets the stage for giving limited consideration here to the constitutional questions that were passed over there. In Kent the Secretary relied on his authority, under his regulations 22 C.F.R. § 51.142 and § 51.135 to require affidavits stating whether or not petitioners then were or ever had been members of the Communist Party, which affidavits petitioners refused to file. The dissenting opinion framed the issue as follows: "Thereupon the Secretary refused to further consider petitioners' applications until such time as they filed the required affidavits. *The Secretary's action clearly must be held authorized by Congress if the requested information is relevant to any ground upon which the Secretary might properly refuse to issue a passport.*" Kent v. Dulles, supra 357 U.S. at 131, 78 S.Ct. at 1121, 2 L.Ed.2d 1204 (Clark, J., dissenting opinion.) (emphasis supplied) The defendant Secretary's authority to require the non-Communist statement is inextricably bound up with the statutory authority under § 6 to deny passports and his authority is dependent on the validity of the statute from which his authority derives. Thus, in determining the validity of the affidavit requirement that the Secretary has promulgated pursuant to his Regulations, we are faced with deciding the validity of the underlying substantive provision, 50 U.S.C.A. § 785—a substantial constitutional question. See Schneider v. Rusk, supra. The decision in Flynn v. Rusk, 219 F.Supp. 709 (D.C.D.C.1963), prob. juris noted Aptheker v. Secretary of State, 84 U.S. 332 (1963), upholding the constitutionality of § 6 of the Act does not preclude this court from passing upon the question since the Supreme Court expressly reserved decision on the question in the *Communist Party* case and has not yet decided it.

A second threshold problem, Copeland's standing to sue and the justiciability of certain of the contentions raised, must also be disposed of before this court embarks on a discussion of the merits of

Copeland's claims. The Government has argued that Copeland does not have the standing to litigate the constitutionality of 50 U.S.C.A. § 785. The Government urges that he has not satisfied the requirement that a litigant who challenges the constitutionality of a statute must show "that he is within the class of persons with respect to whom the act is unconstitutional and that the alleged unconstitutional feature injures him." Heald v. District of Columbia, 259 U.S. 114, 123, 42 S.Ct. 434, 435, 66 L.Ed. 852 (1922). See McGowan v. Maryland, 366 U.S. 420, 429–430, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). The Government correctly adumbrates certain other "standing" principles that it claims have bearing on Copeland's status: that it will not suffice that Copeland has an interest undifferentiated from the "mass of his fellow citizens," Doremus v. Board of Education, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952) and that, in addition, Copeland must show a direct injury to a personal or property right that has been wrought by the challenged legislation. The Government contends that Copeland has no personal rights at stake here and that he possesses nothing more than a general interest in the vindication of his personal philosophy that political beliefs and associations may not be made the ground for denying the right to travel. The Government claims that Copeland, by not admitting membership in the class upon which the statute impinges—the Communist Party—may not assert the interest of that class, "an interest possessed by the people generally," Stark v. Wickard, 321 U.S. 288, 304, 64 S.Ct. 559, 568, 88 L.Ed. 733 (1944); Frothingham v. Mellon, 262 U.S. 447, 488, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), and not personal to

Copeland. To be sure, the Government has correctly set forth the broad principles relating generally to a litigant's standing, but it has failed to apply them with precision in the factual frame of reference posed by Copeland's dilemma.

The "standing" concept is but one doctrine within a broad category of judicial precedent that is concerned with the "uses and non-uses of techniques of withholding ultimate constitutional adjudication." Bickel, Foreword: The Passive Virtues, The Supreme Court, 1960 Term, 75 Harv.L.Rev. 40 (1961). The power to review Congressional enactments, which is implicit in the adjudicatory function of the Supreme Court and the inferior federal courts, includes, perforce, within its amplitude the awesome power to declare Acts of Congress void for repugnance to the Constitution. Marbury v. Madison, 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 (1803); See Hart and Wechsler, The Federal Courts and the Federal System, 92–95 (1953). But the duty to pass upon the validity of an Act of Congress is a function of such "great gravity and delicacy" Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 345, 56 S.Ct. 466, 80 L.Ed. 688 (1935) that the Court has circumscribed the exercise of this function by unyielding insistence that the jurisdiction of the federal courts be limited to actual "cases and controversies." [15] And in cases within its jurisdiction, the Court has developed rules of construction in order to avoid passing on many of the constitutional questions pressed upon it. Id. 297 U.S. at 346, 56 S.Ct. at 482, 80 L.Ed. 688. The Court has recognized that it has jurisdiction to exercise only "judicial power," that is to say, adjudicatory power, and that its responsibility to maintain the delicate balance between

15. Article III, Section 2, United States Constitution, reads in part:
 "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;— to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State;— between Citizens of different States;— between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects."

separate branches of the Federal government is an important consideration that demands self-restraint against intrusions upon the Congress or the Executive through a zealous use of the power of judicial review. See Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 151, 71 S.Ct. 624, 95 L.Ed. 817 (1951).

█ The constitutional limitation of Article III, "all Cases" and "Controversies" is, indeed, the touchstone concept of constitutional justiciability. Muskrat v. United States, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911). But the constitutional limitation of Article III is not the sole restriction on the jurisdiction of the Supreme Court and the lower federal courts. To implement and carry forward the constitutional limitation in cases raising constitutional questions, the federal courts have submitted themselves to certain self-imposed doctrinal disciplines which the courts employ for their governance in cases within their jurisdiction. See Poe v. Ullman, 367 U.S. 497, 503, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961). These doctrines, referred to as "standing," "ripeness," "mootness," "advisory opinions" and "political question" operate to contain the federal courts within the bounds of their constitutional limitations by preventing them from making abstract pronouncements which are not final because they are subject to revision by another branch of the Government. See Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 161–156, 71 S.Ct. 624, 95 L.Ed. 817 (1951); Hayburn's Case, 2 Dall. 408, 2 U.S. 408, 1 L.Ed. 436 (1792); The Correspondence of the Justices, Hart and Wechsler, The Federal Courts and the Federal System, 75–77, 92–95 (1953). The operation of these doctrines seeks to insure that the adjudicatory process operates "under the impact of a lively conflict between antagonistic demands, actively pressed, which make resolution of the controverted issue a practical necessity." Poe v. Ullman, supra 367 U.S. at 503, 81 S.Ct. at 1755, 6 L.Ed.2d 989. All of these factors, i. e., a fastidious regard for the constitutional limitations on the Federal courts' jurisdiction, the concern for the preservation of the judicial function, and the concern for the courts' role as arbiters in a system of government founded upon a delicate balance of powers has bent the Federal courts away from the exercise of judicial review unless the nature of the action, the injury inflicted, and the relationship of the parties presents to the court a concrete "case" or real "controversy" in which the outcome is of significance to the litigants.

█ When Copeland's status is viewed in the context of these principles concerning constitutional justiciability it becomes readily apparent that his broadside assault raises a single justiciable issue pertaining to the validity of § 6 of the Act: whether § 6, upon which the validity of the affidavit requirement necessarily depends, is violative of the Fifth Amendment's Due Process prohibition against arbitrary and capricious legislative remedies.

█ Copeland has suffered an injury to a valuable personal right, inasmuch as his inability to obtain a passport is tantamount to a deprivation of his constitutional right to travel abroad. See Kent v. Dulles, supra 357 U.S. at 127–130, 78 S.Ct. at 1118–1121, 2 L.Ed.2d 1204; Worthy v. Herter, 106 U.S.App.D.C. 153, 270 F.2d 905, 909 (1959), cert. denied, 361 U.S. 918, 80 S.Ct. 255, 4 L.Ed.2d 186 (1959); Shachtman v. Dulles, 96 U.S. App.D.C. 287, 225 F.2d 938 (1955); Bauer v. Acheson, supra.[16] This deprivation

---

16. The right to travel, which was first afforded Constitutional recognition in the Supreme Court in Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958) has its antecedents in Anglo-American history. The Court of Appeals decision, which was reversed in Kent, Briehl v. Dulles, 101 U.S.App.D.C. 239, 248 F.2d 561, 568–569 (1957), recounts this history and points out that the Magna Charta deprived the King of the right to prevent foreign travel. See Note, Passports and Freedom of Travel: The Conflict of a Right and a Privilege, 41 Geo.L.J. 63 (1952) for an account of the history of the status of freedom

of a valuable personal right results from the Secretary's refusal to process those applications in which the non-Communist oath has been deleted since information concerning Communist Party membership is considered material and relevant to the qualifications for passport facilities, under § 6 of the Act and the regulations thereunder, 22 C.F.R. § 51.135 and § 51.142. See Kent v. Dulles, supra 357 U.S. at 130, 131, 78 S.Ct. at 1120, 1121, 2 L.Ed.2d 1204. Thus, plaintiff has suffered a direct and palpable injury as a result of the Secretary's interpretation of the affidavit requirement and he has standing, therefore, to mount a limited constitutional attack against the passport statute which has served as the substantive basis for inflicting the injury. Cf. Tileston v. Ullman, 318 U.S. 44, 63 S.Ct.

493, 87 L.Ed. 603 (1943); Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915); Joint Anti-Fascist Refugee Comm. v. McGrath, supra 341 U.S. at 151–156, 71 S.Ct. at 637–640, 95 L.Ed. 817.

▆▆▆▆ But the fact that an issue is ripe for adjudication does not confer upon Copeland the right to secure a judicial determination of all the questions and contentions that he has raised. An analysis of Copeland's First Amendment arguments—viewed against the background of his refusal either to admit or deny Communist Party membership reveals that these contentions rely for their justiciability upon hypothetical factual situations that look only to future or prospective impairment of constitutional rights.[17] Although these arguments are

---

of travel at Common Law. See also Comment, The Passport Puzzle, 23 U. Chi.L.Rev. 261, 268–269, n. 38–43 (1956) for additional historical discussion of the status of the right to travel at Common Law in England.

The Constitution of the United States, Article IV, Section 2, clearly recognizes the right of citizens to travel among the various states. "[T]he right to remove from one place to another according to inclination, is an attribute of personal liberty, and the right, ordinarily, of free transit from or through the territory of any State is a right secured by [the due process clause of] the Fourteenth Amendment * * *." Williams v. Fears, 179 U.S. 270, 274, 21 S.Ct. 128, 129–130, 45 L.Ed. 186 (1900). On freedom of movement generally see Crandall v. Nevada, 6 Wall. 35, 44, 18 L.Ed. 744 (1867); Edwards v. People of State of California, 314 U.S. 160, 177, 62 S.Ct. 164, 86 L.Ed. 119 (1941).

For a comprehensive account of the "English Roots" of the Freedom to Travel and United States Passport history, see Report of the Special Committee to Study Passport Procedures of the Association of the Bar of the City of New York, FREEDOM TO TRAVEL, 1–22 (1958).

The Universal Declaration of Human Rights, to which the United States is a signatory provides: "Article 13(2): Everyone has the right to leave any country, including his own." Universal Declaration of Human Rights, 19 Dep't State Bull. 753 (1948). And see Vestal, Freedom of Movement, 41 Iowa L.Rev. 6, 13–14 (1955).

17. On September 26, 1963, the plaintiff filed an affidavit explaining the reasons for his failure to execute the non-Communist affidavit. Copeland's affidavit was prompted by the Government's contention that Copeland's failure to execute the oath could be best explained by the fact that he was not a Communist Party member and simply refused to be interrogated as to his beliefs: Copeland stated in his affidavit: "The latter [defendant's attorneys] have suggested that I intended by my supplementary statement to say that I was not a member of a group required to register as a Communist organization under the * * * Act. I did not intend to say any such thing. I refuse to state my political opinions or my organizational connections for the purpose of obtaining a passport. And I believe that any ruling that requires me to do so is an unjust restriction of my right to travel * * *. But my crossing out of the relevant sentences on the application form was not motivated by my possible membership in such organization. It was motivated by my conviction that the State Department has no power to make the inquiry as a condition to my exercise of my right to travel."

Despite this noncommittal attitude, Copeland has advanced the following First Amendment contentions:

(a) that § 6 denies an individual of his right to travel because of his asso-

vigorously advanced, the issues, nevertheless, do not stand in a justiciable posture since Copeland is not the proper person to raise them. See Sedler, Standing to Assert Constitutional Jus Tertii in the Supreme Court, 71 Yale L.J. 599 (1962); But see N.A.A.C.P. v. Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). Copeland's noncommittal attitude vis-a-vis Communist Party membership perforce excludes him from that category of individuals who may possibly have standing because the consequences of a passport denial may impinge upon their associational rights by either deterring them from joining the Party or withdrawing from the association. It also deprives him of standing to raise the bill of attainder issue. Cf. United States v. Lovett, 328 U.S. 303, 324, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946). Copeland's failure to obtain a passport is not due to Communist Party membership. There is no admitted Party member before the court, at this juncture, who can assert the right of association of a Communist Party member, whether "active" or "inactive," knowledgable or so-called "innocent." Moreover, there is nothing in the record to warrant this court's finding that Communist Party members, not now before the court, have withdrawn or will withdraw from the Party because of the fear of § 6's passport denial sanction. And no one knows how many prospective members, if any, have been deterred from joining the Party or giving it their support in anticipation of the consequences of applying for a passport. To make these latter claims of Copeland the occasion for adjudication of the constitutional issues that he seeks to raise would require this court to deal with abstract questions and not with legal issues presented in an actual case. Cf. Communist Party v. Subversive Activities Control Board, supra, 367 U.S. at 70–81, 81 S.Ct.

at 1396–1402, 6 L.Ed.2d 625; International Longshoremen's & Warehousemen's Union, Local 37 v. Boyd, 347 U.S. 222, 74 S.Ct. 447, 98 L.Ed. 650 (1954); United Public Workers of America v. Mitchell, 330 U.S. 75, 85–91, 67 S.Ct. 556, 91 L.Ed. 754 (1947).

Turning now to the merits of Copeland's claims, the frame of reference for his Fifth Amendment argument is the doctrine of Nebbia v. People of State of New York, 291 U.S. 502, 525, 54 S.Ct. 505, 510–511, 78 L.Ed. 940 (1934) that "The Fifth Amendment * * * do[es] not prohibit governmental regulation for the public welfare. [I]t merely condition[s] the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. * * * [T]he reasonableness of each regulation depends upon the relevant facts."

Copeland claims that § 6's proscription against granting passport facilities to Communist Party members is arbitrary and capricious because it imposes sanctions on persons because of their legitimate political activity. Copeland seeks to have the court accept the naive contention that the sanction of passport denial is unreasonable and arbitrary because the Communist Party fits within the traditional notions of American political parties and that the travel of its members need not be circumscribed.

But membership in the Communist Party is not akin to membership in one of our traditional political parties. The Communist Party has long since passed beyond the pale of partisan political activity, if, indeed, it ever restricted itself to such a limited goal. A comparison of

ciation with an organization which engages in advocacy, (p. 6),
(b) because § 6 acts as a discouragement of association, (p. 7),

(c) and because it applies to "inactive members", (p. 10),
(d) and because of its application to persons who do not know or believe in the illegal purposes of the Party.

the functions of American political parties with the function of the Communist Party illustrates the difference and points up the need for the Party's regulation. Major political parties in the United States "are held together by rather casual acceptance of general principles, the influence of leaders, and sometimes by the cohesive power of patronage. Membership in the party carries with it little assurance that the member understands or believes in its principles and none at all that he will take orders from its leaders. * * * Membership in the Communist Party is totally different. The Party is a secret conclave. Members are admitted only upon acceptance as reliable and after indoctrination in its policies, to which the member is fully committed. * * * Moreover, each pledges unconditional obedience to party authority. * * * For any deviation from the party line they are purged and excluded." American Communications Ass'n v. Douds, 339 U.S. 382, 431–432, 70 S.Ct. 674, 700–701, 94 L.Ed. 925 (1950) (Jackson, J., concurring opinion).

Membership in the Communist Party constitutes membership in a component arm of the world-wide Communist movement, which has been recognized by our Government to be an active international conspiracy; a world-wide revolutionary movement that seeks to attain a Communist totalitarian dictatorship throughout the world. See Communist Party v. Subversive Activities Control Board, supra, 367 U.S. at 36–69, 81 S.Ct. at 1379–1396, 6 L.Ed.2d 625; Barenblatt v. United States, 360 U.S. 109, 125–134, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959); Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957); Galvan v. Press, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed.

911 (1954); Carlson v. Landon, 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952); Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951). Our courts have accepted the view, which was given formal expression by Congress in Section 2(i) of the Subversive Activities Control Act, 50 U.S.C.A. § 781(1), that the tenets of the Communist Party include the ultimate establishment of a totalitarian government in the United States by force and violence. Communist Party v. Subversive Activities Control Board, supra; Barenblatt v. United States, supra, 360 U.S. at 128, 79 S.Ct. at 1093–1094, 3 L.Ed.2d 1115; Scales v. United States, 367 U.S. 203, 229–254, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961). In upholding the registration of the Communist Party under § 7 of the Act, 50 U.S.C.A. § 786, the Supreme Court sustained the finding of the Subversive Activities Control Board that the Communist Party of the United States was a Communist-action organization,[18] one that is substantially directed, dominated or controlled by the Soviet Union, the foreign government that controls the world-wide Communist movement, and operates primarily to advance the objectives of that movement. The objective of this movement is to establish a totalitarian dictatorship through the use of "treachery, deceit, infiltration into other groups (governmental and otherwise), espionage, sabotage, terrorism, and any other means deemed necessary, * * *" 50 U.S.C.A. § 781(1). Communist Party v. Subversive Activities Control Board, supra. The Supreme Court upheld the Board's determination and concluded, upon a review of the record before the Board, that the Communist Party unerringly and unwaveringly followed the dictates of the Soviet

---

18. 50 U.S.C.A. § 782(3) (a) provides:
"(3) The term 'Communist-action organization' means—
"(a) any organization in the United States (other than a diplomatic representative or mission of a foreign government accredited as such by the Department of State) which (i) is substantially directed, dominated, or controlled by the foreign government or foreign organization controlling the world Communist movement referred to in section 781 of this title, and (ii) operates primarily to advance the objectives of such world Communist movement as referred to in said section; * * *."

Union "not by the exercise of independent judgment on the intrinsic appeal that those dictates carry, but for the reason that they emanate from that country or organization. No more apt term than domination or control could be used to describe such a relationship." Id., 367 U.S. at 39–40, 81 S.Ct. at 1380–1381, 6 L.Ed.2d 625.

Thus, the nature of the activity that Congress, through the operation of § 6 seeks to regulate concerns a domestic organization that is committed to the goal of overthrowing our Government by the use of a wide variety of nefarious means. Although the members of this organization may be nominally American citizens, they are subject to the "iron discipline" of the foreign government that directs the Communist movement, subject to the command to take action against our Government.

Congress further found in Section 2(8) of the Act, 50 U.S.C.A. § 781(8), that:

"[d]ue to the nature and scope of the world Communist movement, with the existence of affiliated constituent elements working toward common objectives in various countries of the world, travel of Communist members, representatives, and agents from country to country facilitates communication and is a prerequisite for the carrying on of activities to further the purposes of the Communist movement."

▉ These Congressional findings concerning Soviet domination, direction and control of the Communist Party, and the finding that international travel is a necessary means for effectuating and advancing the goal of world domination ordinarily would be sufficient to supply the factual frame of reference within which the court could then determine whether the passport proscription of § 6 is a reasonable means to achieve a legitimate legislative end. In rendering this due process evaluation, the court is aided by the rule that the Congressional find-

ings are binding on this court provided Congress has power over the subject matter and its findings, after extensive investigation, are not baseless. See Flynn v. Rusk, supra, 219 F.Supp. at 712–713; Communist Party v. Subversive Activities Control Board, 96 U.S.App.D.C. 66, 223 F.2d 531, 565 (1954). Since Congress' findings concerning the nature of the Communist threat "[are] the product of extensive investigation by Committees of Congress over more than a decade and a half. * * * [w]e certainly cannot dismiss them as unfounded or irrational imaginings." Communist Party v. Subversive Activities Control Board, supra, 367 U.S. at 94–95, 81 S.Ct. at 1409–1410, 6 L.Ed.2d 625.

But plaintiff would have the court intrude itself into the legislative fact-finding process and overturn the Congressional findings concerning the utilization of international travel by members of the Communist Party. Plaintiff points to the Modified Report of the Subversive Activities Control Board; Brownell v. Communist Party of the United States, No. 51–101, (December 18, 1956). He urges that the report contains no finding of significant travel by Communist Party members after 1936. 1936, it should be remembered, was the most recent date on which the Board found that members of the American Communist Party regularly attended Soviet schools for training and instruction in the strategy and tactics of the world Communist movement. The Board's report refers to four later instances of foreign travel. The report points up the fact that "a correspondent of the Daily Worker is stationed in Moscow," and notes three post-1936 trips by Elizabeth Gurley Flynn, a party executive, to England and France in 1945, 1949, and 1950. From this catalogue of evidence, Copeland concludes that there is no legislative need to attempt to curtail travel by Communist Party members since the Communist goal of world domination is not sought to be effectuated through international travel.

But the plaintiff's contention is insubstantial. While Copeland's arguments admit that travel was a much-resorted to method of advancing the Communist conspiracy in the recent past, it fails to demonstrate that either the movement's objectives or methods have changed to the extent that travel is no longer employed as an expedient. In fact, the converse is the truth. Travel by members of constituent Communist parties has been recognized by the admission of the Communist leaders to be a necessary measure to further the World Communist program. See Subversive Activities Control Board, Modified Report, p. 75 (1956). The coordination of the efforts of world Communism, the Communist leaders have declared, requires the continuation of regular contacts between Communist parties with a view to achieving mutual understanding, exchange of experience and voluntary coordination of activities of the Communist parties. *Id.* at 75. And the absence of contact between diverse components of the Communist conspiracy has been regarded as a hindrance to the effective coordination of Communist movements throughout the world. *Ibid.* The Board's Modified Report sufficiently demonstrates that Communist Party members took trips abroad to receive indoctrination and training on Communist strategy and policies; to teach or lecture at Communist schools; to serve the Soviet Union and the international Communist movement through the medium of Communist international organizations; to conduct official business on behalf of international Communism; to report to leaders of the Communist movement in the Soviet Union and to represent the party at international party functions.[19] The fact that the findings of the Board enumerate only occasional examples of international travel by Communists after 1950 does not undermine the Congressional finding. For substantial evidence such as appears in the Board's report, that international travel has been a frequently used method of intercommunication in the recent past, lends support to the conclusion, in the absence of countervailing evidence, that the methods or objectives have not changed and that international travel continues at the present time to be an equally important tool of subversion. "Where the current character of an organization and the nature of its connections with others is at issue, of course past conduct is pertinent. Institutions, like other organisms, are predominantly what their past has made them. History provides the illuminating context within which the implication of present conduct may be known." Communist Party v. Subversive Activities Control Board, supra, 367 U.S. at 69, 81 S.Ct. at 1396, 6 L.Ed.2d 625.

This conclusion concerning the present use of international travel is entirely reasonable. The court cannot reject this conclusion, particularly in the absence of evidence to the contrary subsequent to the enactment of the 1950 Act,—which itself was pinioned on findings developed after extensive investigation by Congress —that the "leopard" of international Communism has changed its spots. See Flynn v. Rusk, supra, 219 F.Supp. at 713.

In 1948 a House committee reporting on a predecessor bill, H.R. 5852, 80th Cong., 2d Sess., determined that legislation was necessary to " * * * cut the threads which bind the international communist conspiracy together by restricting travel of members of the American section of the World Communist Movement." H.R.Rep.No.1844, 80th Cong., 2d Sess. 3 (1948). The same compelling necessity for similar restrictive legislation was voiced in the debates which preceded the enactment of the Internal Security Act of 1950, 50 U.S.C.A. § 781 et seq. 94 Cong.Rec. 5850, 5851 (1950). See also H.R.Rep.No.2980, 81st

19. See Modified Report of the Subversive Activities Control Board, Brownell v. Communist Party of the United States, No. 51–101 (December 18, 1956), 2, 113, 102, 103, 134, 137, 145, 161, 165–169, 171, 198, 199.

Cong., 2d Sess. 2 U.S.Code Cong. & Ad. News, 81st Cong., 2d Sess. p. 3886 (August 20, 1950).

Nor can the court ignore the facts of life concerning the *perfervidum ingenium* of the world Communist movement. Rather than present a picture of changed conditions, the recent activities of the international Communist conspiracy dictated by the Soviet Union illustrate that the Congressional findings obtain with equal force and validity today. "The present is a period of great international tension in which the principal threat derives from the international Communist conspiracy, including its domestic manifestations in the Communist Party of the United States of America. The continuing uneasy truce between the two opposed systems is called, in the absence of actual hostilities, a cold war. The fact of the cold war cannot be forgotten. It is real, it is intense, and it is dangerous." Report of the Special Committee to Study Passport Procedures of the Association of the Bar of the City of New York, Freedom to Travel, 41–42 (1958). Recent evidence concerning the continuation, if not intensification of Soviet espionage activity in this country, as well as throughout the world, is ample proof that Congressional concern over the spread of the Communist menace through international travel is hardly a tilt against imaginary windmills.[20] See Abel

20. Finding 12 of the "Congressional finding of necessity" in the Subversive Activities Control Act, 50 U.S.C.A. § 781 (12) finds:

"The Communist network in the United States is inspired and controlled in large part by foreign agents who are sent into the United States ostensibly as attachés of foreign legations, affiliates of international organizations, members of trading commissions, and in similar capacities, but who use their diplomatic or semidiplomatic status as a shield behind which to engage in activities prejudicial to the public security."

A list of the major international spy cases reported in 1963, compiled by the New York Times, indicates that the Congressional findings were a correct, if not clairvoyant, appraisal of the espionage threat.

"Feb. 7. Australia accused Ivan F. Skripov, first secretary of the Soviet Embassy in Canberra, of trying to enlist a woman intelligence agent to spy. Skripov and his wife were expelled.

"Feb. 26. Iceland expelled two Soviet diplomats, Lev Kisilev and Lev Dmitriyev, for trying to enlist an Icelander to get information about the United States base at Keflavik.

"March 14. Turkey expelled Cornel Rizu, third secretary in the Rumanian Embassy, after he was found copying a classified document of the North Atlantic Treaty Organization."

"* * *

"May 21. France accused Polish-born Jean Pikus, a sailor in the French Naval Reserve, of spying for the Soviet bloc.

"* * *

"June 20. British military officials in West Germany arrested Cpl. James Michael Wood of the British Army and charged him with stealing 40 classified documents from his signals squadron and trying to deliver them to a Soviet military mission.

"June 24. Britain accused the third secretary of the Czech Embassy, Presmsyl Holan, of attempted espionage and ordered him to leave the country.

"June 25. Sweden announced the arrest of Swedish Air Force Col. Stig Erik Wennerstrom, on charges of spying for the Soviet Union for 15 years. Two Soviet diplomats, Wennerstrom's alleged contacts, were ordered expelled.

"July 1. Britain disclosed that a former British diplomat and newspaperman, H. A. R. Philby, whom it accused of alerting Guy Burgess and Donald Maclean, Britons who spied for the Soviet, in 1951, had fled behind the Iron Curtain.

"July 1. The State Department ordered Gennadi G. Sevastyanov, a Soviet Embassy cultural attache in Washington, to leave the United States for attempting to recruit a Russian-born employe of the United States Central Intelligence Agency as a Russian spy.

"July 2. The Federal Bureau of Investigation arrested four persons and charged them with conspiring to spy for the Soviet Union. Ivan D. Egorov, a personnel officer at the United Nations, and his wife, Aleksandra, were arrested in New York and later sent back to the Soviet Union in return for two Americans held by the Russians. Also arrested were a Washington couple using the names of Robert and Joy Ann Baltch.

"July 15. A British jury found Giuseppe Martelli, Italian physicist, not

v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960).

Thus, our Government is faced, in reality, with defending our country against an external enemy that has formed within our borders, a closely knit organization whose members willingly submit to its "iron discipline" to further the Communist conspiracy. Travel abroad by members of this tightly disciplined subversive movement is obviously a facile method of communication between Communists in this country and the Communist policymakers and their agents in the Soviet Union and its satellites. Travel becomes such a prized method of communication because the facts concerning each citizen's travel intentions are by their very nature inherently subjective and flexible. To be sure, the domestic operation of this international conspiracy is combatted by the criminal processes under the Smith Act, 18 U.S.C.

§ 2385, but we find no difficulty in accepting the Congressional conclusion that the criminal sanction is singularly ineffective for dealing with the *external* operation of the international conspiracy.[21] Once the bird has flown, or once a Communist with a passport has left the country, he is unhampered in his movements and is relatively free to act in a manner inimical to the interests of our country. And "[i]f an avowed Communist is going abroad, it may be assumed that he will take counsel there with his fellows, will arrange for the steady and dependable flow of cash and information, and do his bit to promote the purposes of the conspiracy." Jaffe, The Right to Travel: The Passport Problem, 35 Foreign Affairs 17, 26 (1956). Cf. The Supreme Court, 1960 Term, 75 Harv.L.Rev. 110. Certainly Congress has the power to grant the Secretary the authority to prevent possible action that can result from

guilty of charges that he was preparing for a career as a Soviet spy. But he was barred from continuing his nuclear research job in Britain.

"July 19. A Federal Court jury in New York convicted Navy Yeoman Nelson C. Drummond of conspiracy to commit espionage for the Soviet Union. He received life imprisonment.

"* * * *

"October 10. The Defense Department disclosed that Sgt. 1st Cl. Jack E. Dunlap, a former clerk-messenger for the National Security Agency, had sold secrets to the Soviet Union over a two-year period before committing suicide last July.

"Oct. 29. The F.B.I. arrested an American electronics engineer and a chauffeur for a Russian trading agency on spy conspiracy charges. Two Soviet diplomats were arrested and then released because they had diplomatic immunity. A third Soviet diplomat was named in charges filed by the F.B.I. but he was not apprehended."
New York Times, Oct. 31, 1963, p. 18, Col. 6 and 7.

Among the many Committee reports which served as the legislative findings for the enactment of the Subversive Activities Control Act are the following:
The Communist Party of the United States, as an Agent of a Foreign Power, H.R.Rep. No. 209, 80th Cong., 1st Sess.; Report on the Communist Party

of the United States as an Advocate of Overthrow of Government by Force and Violence, H.R.Comm.Print, 80th Cong., 2d Sess.; Report of the Committee on un-American Activities to the United States House of Representatives, Eightieth Congress, H.R.Comm.Print, 80th Cong., 2d Session; The Strategy and Tactics of World Communism, H.R.Doc. No. 619, 80th Cong., 2d Sess.
See generally Communist Party v. Subversive Activities Control Board, supra, 367 U.S. at 94, n. 4, 81 S.Ct. at 1409, 6 L.Ed.2d 625.

21. For the statutes imposing penal sanctions for the commission or the attempt or conspiracy to commit espionage, sabotage, sedition or subversion, see 18 U.S.C. §§ 371, 791–797, 2151–2156, 2381–2390. The Internal Security Act treats conduct that would substantially contribute to the establishment of a foreign directed totalitarian dictatorship. See 50 U.S.C.A. § 783. Other criminal sanctions in related or tangential areas are: 50 U.S.C.A. § 843, The Communist Control Act dealing with persons who become or remain members of the Communist Party; The Foreign Agents Registration Act, 18 U.S.C. § 951; the act prohibiting private correspondence with foreign governments with intent to influence its measures in relation to disputes or controversies with our Government; 18 U.S.C. § 953.

allowing this potentially destructive form of communication to remain unrestricted. Section 6 attempts to do just that by inhibiting organizational communication among the constituent elements of the world Communist movement, thereby reducing the opportunity for personal contacts. In Congress' considered judgment the denial of passports to present or recent members of the Party may render the world Communist movement less effective. And hopefully, foreign training, foreign assignments and foreign activity on behalf of the world Communist movement thus would be similarly stymied. Section 6 is limited in its application to present members of the Communist movement—to individuals during the period of their participation in Party activity and during the period which they are subject to its discipline. The narrow restriction interdicts only those who are instruments of the international Communist movement while they so act. The means chosen by Congress provides a specific remedy to meet the evil, a "remedy [that] bears a reasonable relation to the evil that the statute was designed to reach." American Communications Ass'n v. Douds, supra, 339 U.S. at 390–391, 70 S.Ct. at 679–680, 94 L.Ed. 925.

Restrictions on the activities of Communist Party members or adherents are hardly novel prophylactic measures. See Beilan v. Board of Public Education, 357 U.S. 399, 78 S.Ct. 1317, 2 L.Ed.2d 1414 (1958); Lerner v. Casey, 357 U.S. 468, 78 S.Ct. 1311, 2 L.Ed.2d 1423 (1958); Adler v. Board of Education, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952); Garner v. Board of Public Works, 341 U.S. 716, 71 S.Ct. 909, 95 L.Ed. 1317 (1951) (restrictions on holding of public employment by Party members); Gerende v. Board of Supervisors, 341 U.S. 56, 71 S.Ct. 565, 95 L.Ed. 745 (1951) (requiring loyalty oath as a precondition to having one's name on public ballot). Plaintiff urges that the court should depart from the rationale of these cases because of a significant distinction between the Governmental interest in regulating public employment and public activities and a supposed less compelling Governmental interest in restricting the exercise of a personal right—the right to travel. The court is not unaware of this distinction.

The court does not equate the considerations involved in deciding whether, on balance, the right to travel must be curbed with the considerations involved in determining whether the Government is required to grant employment or a place on the public ballot to persons whose Communist membership would render them suspect of violating the public trust. The court does not seek to upgrade or downgrade the right to travel and does not assign to it a particular position in the hierarchy, if there be such, of individual rights and liberties. Assuredly, the right to travel is a significant right. But important as it is, the right to travel is no more important than the First Amendment's rights of free speech, association, press and assembly which have often been referred to as occupying a "pre-eminent" position in our society. Yet even these First Amendment liberties, considered so basic to the foundation of our free society, are not absolute and have yielded when the public necessity and common good outbalanced the abridgement to the protected right. See Bickel, Foreword, The Passive Virtues, supra at 41; But see Black, The Bill of Rights, 35 N.Y.U.L. Rev. 865, 867 (1960). The right to travel may similarly yield to a passport restriction which bears a reasonable relation to the danger of permitting unrestricted international travel by members of the Communist conspiracy.

Relying on the dissent in Briehl v. Dulles, supra, 248 F.2d at 587, Copeland points to the availability of several criminal statutes which he claims are "alternative remedies designed to reach the conduct forbidden here. * * * "[22] Because these statutes require proof of criminal conduct and provide trial by jury, Copeland asserts that the statutes

22. Ibid.

impose "more moderate controls" than the § 6 sanction of passport denial. And the availability of "more moderate controls," he continues, must be considered when the court strikes the Due Process balance and arrives at a judgment as to whether the remedy bears a reasonable relation to the evil that the statute was designed to reach. See Dennis v. United States, supra, 341 U.S. at 524, 71 S.Ct. at 874–875, 95 L.Ed. 1137 (Frankfurter, J., concurring opinion) quoting Freund, On Understanding the Supreme Court, pp. 27–28. In conclusion, he urges that when the availability of these so-called alternatives is weighed in the balance, the necessity for § 6 is not apparent and § 6 must fall.

But assuming *arguendo* that these criminal statutes are "more moderate alternatives," it does not follow that they are equal to the task of meeting the special exigencies involved in the control of subversive activities. To be sure, the Government can always punish proscribed conduct after it has occurred. But the crucial distinction that Copeland fails to recognize is that these post-facto criminal remedies, which punish subversion, do not meet the special problem posed in preventing it. When the Government after extensive investigation, as here, finds that an identifiable class of persons is pledged to subvert its institutions, the public welfare requires that the Government not stand by in the hope that penal statutes may possibly deter acts of subversion by members of the class that are most likely to commit them. For once the members of the Communist conspiracy are unleashed to perform their insidious mission, the criminal prosecution of the Communist individual may be only a hollow victory when measured against the grave injury that the subversion may have caused to the public

security. To attempt to use a penal statute as a substitute for a regulatory statute ignores an essential difference. A regulatory statute is calculated to remedy an evil by imposing controls gauged to prevent acts which may be inimical to the interests of the United States, as opposed to a penal statute which is keyed to a *fait accompli* of proscribed conduct.

Still, in the Fifth Amendment Due Process context plaintiff claims that § 6 enacts a presumption of scienter and applies to all members of the Communist Party, whether or not they have knowledge concerning the illegal purposes which have been imputed to the Party by Congress. Therefore, Copeland asserts that innocent members of the Party necessarily must be denied passports without reference to the quality of their activity and knowledge. But this question, also, is not ripe for consideration at this juncture for the plaintiff has failed to make any claim whatsoever concerning his membership in the Party. Even had Mr. Copeland stated that he was an "inactive and innocent" member of the Party, the scienter question would not be ripe for consideration. Before the scienter question could be considered ripe and therefore justiciable, Copeland would have to demonstrate a disclosure of present membership in the Party, a tentative denial of a passport, and proof at a hearing held pursuant to the regulations[23] that his membership was "passive" or "innocent" culminated by a showing of Communist Party membership. But at this stage, absent any admission or allegation concerning his political affiliation, he does not have the standing to raise the question of whether the Fifth Amendment's Due Process Clause permits the denial of a passport to a hypothetical person—a so-called "innocent"

23. Upon a tentative denial of a passport, see 22 C.F.R. § 51.137 (Supp.1963), the applicant may obtain an administrative review of the determination. A hearing is available with the right to be represented by counsel; the right to be informed of the evidence upon which the Passport Office has relied as the basis of the tentative denial; the right to be informed as to the source of the evidence; to confront and cross-examine adverse witnesses. The applicant may appeal an adverse decision to the Board of Passport Appeals, where further proceedings may be had. See 22 C.F.R. § 51.137–§ 51.170.

or "passive" member of the Communist Party.

The court is also not called upon to decide, and therefore does not, the full scope of the Secretary's constitutional power to curtail travel of Communist Party members. The court, however, is not unaware that in criminal prosecutions under the membership clause [24] of the Smith Act the Supreme Court has required a showing that the Communist be an "active member," possessing a specific intent to bring about the organization's criminal ends. See Scales v. United States, supra. But the question of whether the Secretary's substantive power to withhold passports is to be similarly limited to "active" members is not before the court.

■ Thus we come, finally, to the narrowest issue posed in this case: Whether present membership in the Communist Party is a valid subject of inquiry which can be made a prerequisite to the issuance of a passport. Or, stated another way, the crucial question is whether the Secretary of State may decline to issue a passport to one who refuses to admit or deny that he is a member of the Communist Party. We think that the Secretary may make such an inquiry and may condition the issuance of a passport on the requirement that the information be supplied.

Section 6 of the Act is an unequivocal declaration of Congressional intent that passports should be denied to Communist members. The affidavit requirement does no more than seek to obtain relevant information so that the Secretary may carry out the Congressional mandate.

■ Copeland seeks to exercise a right for which certain eligibility requirements have been promulgated but has declined to execute the affidavit which would supply material information. The Secretary, unlike the situation in the first Konigsberg case, Konigsberg v. State Bar, 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810 (1957) does not seek to draw any adverse inference from Copeland's failure to execute the affidavit or, for that matter, any inference at all. All that the Secretary is asserting is his right to have certain information which is relevant to the exercise of a valid authority. The court sees no reason why the Secretary, who is charged with the duty of passing upon the eligibility of passport applicants, must be forced to act in spite of the fact that he has not received answers to relevant questions which seek to elicit information necessary for a responsible decision. See Briehl v. Dulles, supra, 248 F.2d at 577-578 (concurring opinion). The defendant Secretary has a duty to thwart the commission of an illegal act by a Communist Party member who applies for a passport. Moreover, in view of § 6's prohibition against the issuance of a passport to a present member of the Communist Party, the defendant certainly has the right to determine whether his own conduct in issuing the passport is lawful. A governmental agency charged with the responsibility for determining the eligibility of an applicant has the authority to seek pertinent information with respect to such eligibility.[25] Blumenthal v. F.C.C., 115 U.S.App.D.C. 305, 318 F.2d 276 (1963); cert. denied, Blumenthal v. United States, 373 U.S. 951, 83 S.Ct. 1679, 10

---

24. Only one prosecution has been reported to date. The New York Times, October 31, 1963, p. 22, col. 2, reports that a Federal Grand Jury in San Francisco returned an indictment against a San Francisco woman for having applied for a passport while a Communist Party member. The woman was arrested but freed on bail. The case is expected to present the first test of the penal provisions of 50 U.S.C.A. § 794, as applied to the passport section, 50 U.S.C.A. § 785.

25. "In the years since World War II, for the first time in a period of peace, the passport has been used as a means for the control of travel, a policy induced by the continuing existence of a national emergency. During the continuance of the emergency the United States passport has taken on additional meaning. While still a document of identity, it has now become the document which the United States requires for departure from the United States and re-entry into the United States except for travel with-

L.Ed.2d 706 (1963); Borrow v. F.C.C., 109 U.S.App.D.C. 224, 285 F.2d 666 (1960), cert. denied, 364 U.S. 892, 81 S. Ct. 223, 5 L.Ed.2d 188 (1960); Cronan v. F.C.C., 109 U.S.App.D.C. 208, 285 F.2d 288 (1960) cert. denied, 366 U.S. 904, 81 S.Ct. 1046, 6 L.Ed.2d 203 (1960). (Communist Party membership a relevant inquiry in F.C.C. application for license.) Accord Konigsberg v. State Bar, 366 U. S. 36, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961). (License to practice law.)

And as a last obstacle to the Secretary's authority to condition the issuance of a passport upon the execution of the non-Communist affidavit, plaintiff has pointed to Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). In Speiser, veterans refused to sign a loyalty oath required by the California constitution and laws as a condition precedent to the enjoyment of a veteran's property tax exemption. The Supreme Court assumed *arguendo* that the State could deny tax exemptions on the basis of a person's political beliefs. Id., 357 U.S. at 529, 78 S.Ct. at 1343–1344, 2 L.Ed.2d 1460. Nevertheless, the Court held that the statute violated the Due Process Clause of the Fourteenth Amendment because the oath requirement placed the burden of proof on the applicant to prove his loyalty before the applicant-taxpayer could benefit by the tax exemption. The Court distinguished the cases such as Douds, since it found that the non-Communist oath in Douds was not directed at penalizing political beliefs but was promulgated to protect the public from the harm that might ensue from permitting potentially dangerous persons from occupying positions of public trust, i. e., labor union office. But the oath in Speiser, the Court concluded, could not be so substantiated, for it dealt directly with speech and the expression of political ideas and its primary purpose was not aimed at the prevention of public injury.

■ The plaintiff would have us believe that Speiser v. Randall strikes at the heart of the affidavit requirement and renders it invalid. But the rationale of Speiser is inapplicable to the non-Communist oath in the case at bar. First, it is apparent that the Government has not placed upon the applicant the burden of proving that he is not presently a member of the Communist Party. All that the oath presently requires is the applicant's cooperation in supplying to the Secretary a statement concerning his Communist membership. Copeland has failed to secure a passport because he has frustrated the operation of one of the Secretary's functions by withholding a material fact. The Secretary's refusal to process an incomplete application presupposes that the Secretary, rather than Copeland, has the burden of proving his Communist Party membership in the event that such a status is contested. In fact, the elaborate administrative regulations which provide for notice, hearing, and appeals from the denial of a passport make it clear that the Secretary has the burden of proof.[26] The "burden of proof" aspect of the Speiser case carries no weight here.

■ Secondly, it is evident that like Douds, but unlike Speiser, the principal aim of the Subversive Activities Control Act and of the affidavit which seeks to implement it, is to insulate the public from the danger of the Communist menace. The Subversive Activities Control Act is a regulatory statute which, like the legislation under attack in Douds, aims at a grave evil, the gravity of which justifies a limited infringement on a person's political activities.

But its main objective, as well as its overriding effect, does not strike at pol-

---

in the Western Hemisphere. And most foreign nations, including a large number of Latin-American nations, require an American citizen to hold a valid United States passport as a condition of travel in those countries. Accordingly, it is clear that the American passport is now indispensably necessary for entry of Americans into most countries of the world." See Freedom to Travel, supra at 22.

26. 22 C.F.R. § 51.135–§ 51.170, supra n. 23.

itical beliefs as such but remedies a condition that constitutes a danger to the public order. The Speiser case does not point up any infirmity in the affidavit requirement.

In sum, then, we hold that § 6 is a valid legislative basis for executive action and that the Secretary may implement his authority thereunder by requesting information, through the medium of the non-Communist affidavit, which is pertinent to the exercise of that authority. See Mayer v. Rusk, supra. We conclude that the Secretary was correct in declining to process the passport application for the reason that Copeland refused to execute the non-Communist oath which the Secretary has promulgated. Accordingly the defendant's motion for summary judgment is granted and the plaintiff's motion for summary judgment is denied. Plaintiff's request for injunctive and declaratory relief is likewise denied.

So ordered.